## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NESSCAP CO., LTD., | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) C.A. No. 06-00764-GMS |
| | ) |
| MAXWELL TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant and | ) |
| Counterclaim Plaintiff. | ) |
| | ) |

## MAXWELL TECHNOLOGIES, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO TRANSFER NESSCAP CO., LTD.'S COMPLAINT FOR PATENT INFRINGEMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (No. 1088)
Karen E. Keller (No. 4489)
1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19801
 (302) 571-6600
kkeller@ycst.com

MORRISON & FOERSTER LLP
David C. Doyle (CA Bar No. 70690)
Brian M. Kramer (CA Bar No. 201780)
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
(858) 720-5100
ddoyle@mofo.com

*Attorneys for Defendant*
*Maxwell Technologies, Inc.*

# TABLE OF CONTENTS

Page

I.     NATURE AND STAGE OF THE PROCEEDINGS ............................................ 1

II.    SUMMARY OF THE ARGUMENT ..................................................... 2

III.   STATEMENT OF FACTS ............................................................ 3

    A.     Plaintiff NessCap Co. Ltd. ......................................................... 3

    B.     Defendant Maxwell Technologies, Inc. .................................... 3

    C.     Maxwell's Litigation Against NessCap in California ............................. 4

    D.     The Connection Between the San Diego Action and This Action .......... 5

    E.     The Connection Between the San Diego Action and the Second
        Delaware Action ..................................................................... 5

IV.    ARGUMENT .......................................................................... 6

    A.     Legal Standards ...................................................................... 6

    B.     This Action Could Have Been Brought in the Southern District of
        California .............................................................................. 8

    C.     The Private Interest Factors Weigh in Favor of Transfer ......................... 8

        1.     The Convenience of Witnesses Outside of This Court's
            Subpoena Power Weighs Heavily in Favor of Transfer .............. 8

        2.     The Location of the Parties and Their Records Weighs in
            Favor of Transfer ................................................................ 11

        3.     NessCap's Choice of Forum is Entitled to Little Deference
            Because NessCap Has No Connection to This Forum .............. 13

    D.     The Public Interests Factors Weigh Heavily in Favor of Transfer ......... 14

        1.     Trying This Case Along With The First-Filed California
            Case Will Be More Efficient and Less Expensive Because
            the Southern District of California Will Have Already
            Invested Significant Time and Resources in Learning the
            Technology of the '544 Patent ................................................ 14

        2.     The Case Handling Statistics for the Southern District of
            California Indicate That It Can Resolve This Matter
            Quickly .............................................................................. 15

        3.     Local Interests Do Not Weigh in Favor of Litigating This
            Action in Delaware ............................................................. 16

V.     CONCLUSION ........................................................................ 18

# TABLE OF AUTHORITIES

**Page**

## CASES

*3Com Corp. v. D-Link Sys., Inc.,*
  C.A. No. 03-014, 2003 U.S. Dist. LEXIS 7120 (D. Del. 2003)...................................12, 13, 15

*Affymetrix, Inc. v. Synteni, Inc.,*
  28 F. Supp. 2d 192 (D. Del. 1998) ..............................................................................7, 8, 13, 15

*Air Prods. & Chems., Inc. v. MG Nitrogen Servs.,*
  133 F. Supp. 2d 354 (D. Del. 2001) .........................................................................................6

*Akamai Techs. v. Cable & Wireless Internet Servs.,*
  344 F.3d 1186 (Fed. Cir. 2003)..................................................................................................5

*Allergan, Inc. v. Alcon Labs.,*
  C.A. No. 02-1682-GMS, 2003 U.S. Dist. LEXIS 2564
  (D. Del. Feb. 25, 2003)..............................................................................................................14

*American Sensor Rx, Inc. v. Banner Pharmcaps, Inc.,*
  C.A. No. 06-1929, 2006 U.S. Dist. LEXIS 66993
  (D.N.J. Sept. 6, 2006)................................................................................................................16

*Bayer Bioscience N.V. v. Monsanto Co.,*
  C.A. No. 03-023, GMS, 2003 U.S. Dist. LEXIS 4594
  (D. Del. March 25, 2003) ..........................................................................................................14

*Burroughs Wellcome Co. v. Giant Food, Inc.,*
  392 F. Supp. 761 (D. Del. 1975) ...............................................................................................13

*Dippold-Harmon Enters. v. Lowe's Cos.,*
  C.A. No. 01-532, GMS, 2001 U.S. Dist. LEXIS 18547
  (D. Del. Nov. 13, 2001)..............................................................................................................11

*EEOC v. University of Pennsylvania,*
  850 F.2d 969 (3d Cir. 1988), *aff'd* 493 U.S. 182 (1990)............................................................7

*Ikos Sys. v. Cadence Design Sys.,*
  C.A. No. 02-1335-GMS, 2002 U.S. Dist. LEXIS 20574
  (D. Del. Oct. 21, 2002)...............................................................................................................17

*Jumara v. State Farm Ins. Co.,*
  55 F.3d 873 (3d Cir. 1995).................................................................................................*passim*

# TABLE OF AUTHORITIES
(continued)

Page

*Kaiser Indus. Corp. v. Wheeling-Pittsburgh Steel Corp.*,
   328 F. Supp. 365 (D. Del. 1971) ........................................................................................... 17

*Markman v. Westview Instruments*,
   52 F.3d 967 (Fed. Cir. 1995) ............................................................................................. 4, 5

*Mentor Graphics Corp. v. Quickturn Design Sys.*,
   77 F. Supp. 2d 505 (D. Del. 1999) ................................................................................. 6, 8, 9

*National Presto Indus. v. West Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996) ................................................................................................. 5

*Plum Tree, Inc. v. Stockment*,
   488 F.2d 754 (3d Cir. 1973) ................................................................................................... 7

*Providian Life and Health Ins. Co. v. Cuna Mut. Ins. Soc'y*,
   No. 96-cv-1797, 1996 U.S. Dist. LEXIS 4109 (E.D. Pa. Mar. 29, 1996) ............................... 16

*Quandt v. Beech Aircraft Corporation*,
   317 F. Supp. 1009 (D. Del. 1970) ......................................................................................... 18

*Shutte v. Armco Steel Corp.*,
   431 F.2d 22 (3d Cir. 1970) ..................................................................................................... 8

*Solomon v. Continental American Life Ins. Co.*,
   472 F.2d 1043 (3d Cir. 1973) ............................................................................................... 15

*Stewart Organization, Inc. v. Ricoh Corp.*,
   810 F.2d 1066 (11th Cir. 1987), *aff'd*, 487 U.S. 22 (1988) ....................................................... 7

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964) ............................................................................................................... 6

*Virgin Wireless, Inc. v. Virgin Enters., Ltd.*,
   201 F. Supp. 2d 294 (D. Del. 2002) ........................................................................................ 6

*Waste Distillation Tech., Inc. v. Pan American Res., Inc.*,
   775 F. Supp. 759 (D. Del. 1991) ........................................................................................... 16

**TABLE OF AUTHORITIES**
(continued)

Page

**STATUTES**

28 U.S.C. § 1404 ..................................................................................................... 6, 7, 8

D. Del. L.R. 83.5 .......................................................................................................... 15

Fed. R. Civ. P. 13 ........................................................................................................... 6

**MISCELLANEOUS**

15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction and
     Related Matters* § 3851 (2d ed. 1986)........................................................................... 8

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This is the second of three patent suits between direct competitors Maxwell

Technologies, Inc. ("Maxwell") and NessCap Co., Ltd. ("NessCap"). The first action

was filed three months ago in the Southern District of California by Maxwell ("the San

Diego action"). In the San Diego action, Maxwell alleges that NessCap's ultracapacitors

infringe Maxwell's ultracapacitor patents. A motion for preliminary injunction is

currently pending before the Honorable John A. Houston, and a hearing is set for

March 1, 2007.

Instead of filing counterclaims in the San Diego action, NessCap filed a motion

to dismiss the San Diego action for improper service and also filed this second suit ("the

Delaware action"), alleging that Maxwell's ultracapacitors infringe NessCap's

ultracapacitor patent. In its press release announcing the filing of the Delaware action,

NessCap directly linked the Delaware action to Maxwell's filing of the San Diego

action:

> Maxwell started the legal battle by filing a lawsuit against
> us for infringement in San Diego, which we will
> demonstrate has absolutely no merit. We and our legal
> team have conducted an extensive review of our patent
> estate and we have determined that NessCap
> ultracapacitors, which Maxwell accuses of infringement,
> are protected by NessCap patents that predate the Maxwell
> patents at issue in the San Diego lawsuit.

(Declaration of Brian M. Kramer ("Kramer Decl.") Ex. 1.) NessCap thereafter filed

another lawsuit in this district, C.A. No. 07-035 ("the second Delaware action"), which

is a "mirror image" of the San Diego action and seeks a declaratory judgment that the

exact patents at issue in the San Diego action are not infringed and are invalid.

1

The Delaware action should be transferred to the Southern District of California. The Delaware action and San Diego action share the same technology, witnesses, evidence, and legal issues. The District of Delaware has no connection to this case, neither party has a physical presence in this state, and all witnesses are outside of this Court's subpoena power. Thus, for the convenience of parties and witnesses, and in the interest of justice, this Court should transfer this case to the district with the first-filed action.[1]

## II.    SUMMARY OF THE ARGUMENT

1.    The relationship between the NessCap patent in the Delaware action and the Maxwell patents in the San Diego action is already at issue in the San Diego action. The San Diego action and Delaware action will have overlapping witnesses, overlapping legal issues, and an overlapping presentation of evidence. Construing claims, managing discovery, and trying the same issues on both coasts will multiply the costs for both parties and will cause an inefficient use of this Court's resources.

2.    The private and public interests from the Third Circuit's *Jumara* transfer analysis favor transfer. In particular, some of the main witnesses are former Maxwell employees who reside within the subpoena power of the Southern District of California and cannot be compelled to testify in Delaware.

3.    NessCap's choice of forum is entitled to little deference because the District of Delaware has no connection to NessCap or the ultracapacitor infringement allegations in this lawsuit. In fact, Maxwell has not sold a single ultracapacitor in the State of Delaware. The Southern District of California has a greater interest in this case because both parties do business in that district, and other companies in that district are among the leading users of ultracapacitor technology.

---

[1]    This motion is limited to C.A. No. 06-00764-GMS.

sd-350554

### III.    STATEMENT OF FACTS

#### A.    Plaintiff NessCap Co. Ltd.

NessCap Co. Ltd. ("NessCap") "is a company located only in South Korea and organized under Korean law." (Kramer Decl., Ex. 2 at 1.) According to NessCap's San Diego filings, "[i]t is engaged in the research, development, production, and sales of electrical energy storage products known as 'ultracapacitors.'" (*Id.*) "[NessCap] has no offices in the United States, is not registered to do business anywhere in the United States, and has no registered agents in the United States." (*Id.*) While NessCap's parent corporation, NessCap, Inc., is a Delaware corporation, NessCap has distanced itself from its parent in the San Diego action: "[T]here is no evidence of an agency relationship between NessCap, Inc. and [NessCap]. [NessCap] operates independently from NessCap, Inc. . . . ." (Kramer Decl., Ex. 3 at 3); "[I]t is apparent that NessCap, Inc. and [NessCap] are two distinct entities." (Kramer Decl., Ex. 4 at 3.)

Maxwell first sued NessCap three months ago because NessCap is selling ultracapacitors that infringe Maxwell's patents through a Minnesota-based distributor. Maxwell's allegations of infringement by NessCap are currently being heard before Judge Houston in the San Diego action. NessCap has conceded that the San Diego court has personal jurisdiction over NessCap, but has yet to articulate why Delaware is the appropriate forum for this lawsuit.

#### B.    Defendant Maxwell Technologies, Inc.

Maxwell, founded in 1965, is a publicly-traded company headquartered in San Diego and is the United States' leading developer and manufacturer of ultracapacitors. (Balanson Decl. ¶ 3.) Maxwell entered the ultracapacitor business in the mid-1990s. (*Id.* ¶ 6.) Over the past ten years, Maxwell has invested over $70 million in its ultracapacitor business. (*Id.*) Maxwell sells a line of ultracapacitors under the BOOSTCAP® name. (*Id.* ¶ 4.) Over the past three years, BOOSTCAP® sales exceeded $35 million. (*Id.* ¶ 5.) While Maxwell is a Delaware corporation, Maxwell

3

does not maintain or own any property, facilities, or operations in Delaware.  (*Id.* ¶ 13.)

No Maxwell employees reside in Delaware.  (*Id.*)  Maxwell has not sold a single

ultracapacitor in the State of Delaware.  (*Id.* ¶¶ 5, 13.)

      Maxwell is the assignee on approximately thirty-four U.S. patents related to

ultracapacitors, with several dozen patents pending.  (*Id.* ¶ 6.)  Two of Maxwell's thirty-

four patents are among the patents being asserted against NessCap in the San Diego

action.  Two other Maxwell patents are prior art to the NessCap patent asserted in this

action and are cited as part of Maxwell's inequitable conduct defense in this case.

(Answer, D.I. 7 ¶¶ 18-19.)

### C.     Maxwell's Litigation Against NessCap in California.

      Maxwell filed the first suit against NessCap and NessCap's parent company in

San Diego on October 17, 2006.  Maxwell alleges that NessCap's products infringe

Maxwell's U.S. Patent Nos. 6,525,924 and 6,631,074 (the "'924 patent" and "'074

patent," respectively) and has sought a preliminary injunction.  Maxwell specifically

alleges that NessCap has unfairly "piggy-backed" off of Maxwell's $70 million

investment in ultracapacitor development by entering the U.S. market with no upfront

marketing investment and infringing products.  (Kramer Decl, Ex. 5 at 1-2; 12-13.)

Specifically, Maxwell has identified instances of NessCap selling and offering for sale

infringing products at below market prices within the Southern District of California.

(*Id.* at 12-13.)

      District Judge John Houston has set a March 1, 2007 hearing date to determine

whether NessCap should be preliminarily enjoined from selling its ultracapacitor

products in the United States.  In reaching a decision on the preliminary injunction,

Judge Houston will invest substantial time (1) learning ultracapacitor technology; (2)

studying both NessCap's and Maxwell's products; (3) studying the patents-at-issue; (4)

construing patent claims pursuant to *Markman v. Westview Instruments*, 52 F.3d 967

(Fed. Cir. 1995), *aff'd*, 517 US 370 (1996); and (5) making preliminary infringement and validity rulings.

### D.     The Connection Between the San Diego Action and This Action.

The San Diego action involves the same parties, the same technology, and the same patents that are asserted in this action.  While NessCap has yet to respond to the allegations in the San Diego action on the merits, NessCap has stated in a press release that its patent at issue in the Delaware action – U.S. Patent No.6,743,544 ("the '544 patent") – will be asserted as invalidating prior art in the San Diego action.  Specifically, in a press release entitled "NessCap Files Patent Infringement Lawsuit Against Maxwell Technologies," NessCap discusses the '544 patent-at-issue in this case and claims that "NessCap ultracapacitors, which Maxwell accuses of infringement, are protected by NessCap patents that predate the Maxwell patents at issue in the San Diego lawsuit." (Kramer Decl., Ex. 1.)  Because the "first step in any invalidity analysis is claim construction," *Akamai Techs. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) (internal citations omitted), the San Diego court will have to perform an independent claim construction of the '544 patent as part of its invalidity analysis. Moreover, to the extent that infringement under the doctrine of equivalents becomes an issue in the San Diego action, and to the extent that NessCap claims that the separate patentability of its '544 patent negates a finding of infringement under the doctrine of equivalents, the San Diego court will have to consider the same '544 patent at issue in this suit. *See National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996) ("The fact of separate patentability is relevant, and is entitled to due weight."). This motion seeks to eliminate the need for both courts to consider the same patent.

### E.     The Connection Between the San Diego Action and the Second Delaware Action.

The Second Delaware action is a "mirror image" of the San Diego action. Maxwell's first-filed suit in San Diego alleges infringement by NessCap of Maxwell's

'924 patent and '074 patent. NessCap's second Delaware action is a declaratory judgment action alleging that it does not infringe the same '924 and '074 patents and that the same patents are invalid. *See generally, Mentor Graphics Corp. v. Quickturn Design Sys.*, 77 F. Supp. 2d 505, 508-09 (D. Del. 1999) (defining "mirror image" action). NessCap's claims in the second action are compulsory counterclaims in the San Diego action. *See* Fed. R. Civ. P. 13(a) (defining compulsory counterclaim as one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim"). Moreover, NessCap's mirror image claims violate the established "first to file" rule. *See, e.g., Air Prods. & Chems., Inc. v. MG Nitrogen Servs.*, 133 F. Supp. 2d 354, 356 (D. Del. 2001) ("The Federal Circuit has recognized the first to file rule noting that, 'as a principle of sound judicial administration, the first suit should have priority, absent special circumstances.'") (quoting *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989)).

## IV.    ARGUMENT

### A.    Legal Standards.

Congress designed the transfer statute, 28 U.S.C. § 1404(a), "to prevent the waste of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense'." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964), quoting *Continental Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960); *see also Virgin Wireless, Inc. v. Virgin Enters., Ltd.*, 201 F. Supp. 2d 294, 299 (D. Del. 2002).

Section 1404(a) states:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

6

Application of the statute is committed to the sound discretion of the Court. *EEOC v. University of Pennsylvania*, 850 F.2d 969, 972, 977 (3d Cir. 1988), *aff'd* 493 U.S. 182 (1990). Deference to the plaintiff's choice of forum does not trump the Congressional intent behind Section 1404(a) that federal litigation proceed in the district best suited to the interests of justice and convenience of the parties and witnesses. *See Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 757-58 (3d Cir. 1973) (noting that the three Congressionally-articulated factors cannot be "automatically outweighed" by the parties' choice of forum); *Stewart Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1076 (11th Cir. 1987) (Tjoflat, J., concurring) ("In enacting section 1404(a), Congress instructed the federal courts to transfer civil actions whenever they deem transfer appropriate."), *aff'd*, 487 U.S. 22 (1988).

The Court's task is to "determine, on an individualized . . . basis, whether convenience and fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citation omitted). In making this determination, the Court must "examine 'all relevant factors to determine whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum.'" *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 196-97 (D. Del. 1998) (citation omitted).

The relevant factors to be considered include both private and public interests. *Id.* at 197. The private interests include: (1) the convenience of the expected witnesses; (2) the convenience of the parties; and (3) the location of records and other documents. The public interests include: (1) the ability of the Court to enforce the judgment; (2) practical considerations making trial easy, expeditious, or inexpensive; (3) administrative difficulties posed by the relative congestion of the two dockets in the respective fora; (4) any local interest in deciding local controversies at home; and (5) the public policies of the fora. *Affymetrix*, 28 F. Supp. 2d at 197; *see also Jumara*, 55 F.3d

7

at 879.[2]  Maxwell, as the movant, must show that the balance of these factors tips in favor of the requested transfer.  *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).

**B.     This Action Could Have Been Brought in the Southern District of California.**

Section 1404(a) requires that the transferee jurisdiction be a "district where [the civil action] might have been brought."  28 U.S.C. § 1404(a).  There can be no dispute that NessCap could have brought this action in the Southern District of California. Maxwell's headquarters and only U.S. operations are located in San Diego.  All BOOSTCAP® ultracapacitors manufactured in the United States are made in Maxwell's San Diego facilities.  (Balanson Decl. ¶ 13.)  Maxwell and NessCap are already litigating the first-filed action in the Southern District of California.  In the San Diego action, NessCap has conceded that the Southern District of California has personal jurisdiction over it by not challenging personal jurisdiction.

**C.     The Private Interest Factors Weigh in Favor of Transfer.**

**1.     The Convenience of Witnesses Outside of This Court's Subpoena Power Weighs Heavily in Favor of Transfer.**

"The convenience of witnesses is often an important factor in a transfer inquiry." *Mentor Graphics*, 77 F. Supp. 2d at 510 (transferring case because of, among other reasons, inconvenience to former employee witnesses who live and work in California) (citing 15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3851, at 415 (2d ed. 1986).  This Court has noted that it is preferable to hold trial where witnesses can be compelled to testify through the court's subpoena power.  *Affymetrix,* 28 F. Supp. 2d at 205 ("It is desirable to hold trial at a place where the personal attendance of witnesses through the use of subpoena power can be

---

[2]     The three other private factors articulated by the Third Circuit in *Jumara* - the plaintiff's choice of forum, the defendant's preferred forum, and whether the claim arose elsewhere - are duplicative of other considerations and are considered in the context of the entire inquiry only.  *Affymetrix*, 28 F. Supp. 2d at 197.

reasonably assured.") (quoting *Pennwalt Corp. v. Purex Industries, Inc.*, 659 F. Supp. 287, 291 (D. Del. 1986)).

Absent a transfer in this case, no non-party witnesses could be compelled to attend trial. Nearly all of the likely witnesses are located in the Southern District of California. No witnesses reside in Delaware. The only non-San Diego witnesses are Maxwell employees who reside in Switzerland but who regularly travel to San Diego for business meetings, and NessCap witnesses, all of whom are presumably located in South Korea.

At this point, the lack of detail in NessCap's complaint makes it harder to ascertain the entire lineup of trial witnesses, but it is certain that none will reside within this Court's subpoena power and most will be located in San Diego. Maxwell currently makes and sells 29 different BOOSTCAP® ultracapacitor products in a range of sizes and modular configurations and has made and sold many more that are not currently on the market. (Balanson Decl. ¶ 5.) NessCap's bare complaint does not give a single example of which of the 29 different BOOSTCAP® ultracapacitors meet the limitations of the '544 patent. (*See* Complaint, D.I. 1 ¶ 9.) However, regardless which specific products NessCap ultimately identifies as the accused devices, it is likely that the San Diego-based employees who designed the accused devices no longer work for Maxwell. Most of those former employees still live in San Diego, and Maxwell is unaware of any who reside within the Court's subpoena power. (Balanson Decl. ¶ 10.) Thus, this Court will not be able to compel their attendance at trial. *See Mentor Graphics*, 77 F. Supp. 2d at 511 (noting that "presence within the subpoena power of the district court for the Northern District of California is a factor that strongly favors transfer").

Counsel for Maxwell has contacted some potential witnesses who have stated that they do not want to attend trial in Delaware. For example, Dr. Priya Bendale is Maxwell's former Senior Director of Research and Development and is the lead inventor of several Maxwell ultracapacitor patents, including one of the patents asserted by

9

Maxwell in the San Diego action and by NessCap in the second Delaware action. (*See* D. I. 1 in C.A. No. 07-0035-GMS, Ex. 2, '074 patent.) Because of her role with both Maxwell's ultracapacitor products and ultracapacitor patents, she is likely to be a witness in both the Delaware and San Diego litigations. The patent-in-suit in the Delaware action, the '544 patent, claims a priority date of April 25, 2000, and an issuance date of June 1, 2004. During that time period, Dr. Bendale was directing Maxwell's ultracapacitor research and development, (Balanson Decl. ¶ 8), making her an important witness regarding the Maxwell prior art that invalidates the '544 patent. Dr. Bendale will already be required to testify in the San Diego litigation because she is the lead inventor of one of the two patents-in-suit. This Court is undoubtedly aware that the lead inventor is generally a key witness in a patent trial.

Dr. Bendale is currently the Vice President of Engineering at Interface Displays & Controls, Inc., which is located in San Diego County. (Kramer Decl., Ex. 6.) As Vice President of Engineering she is responsible for her company's entire research and development program. (*Id.*, Ex. 7.) She supervises the engineering and design staff and reports directly to the President and CEO of the company. (*Id.*) Counsel for Maxwell contacted Dr. Bendale about the possibility of providing testimony in the San Diego and Delaware litigations. Dr. Bendale explained that traveling to Delaware for trial will interrupt her personal life and her business responsibilities. (Kramer Decl. ¶ 8.) It would be more convenient for Dr. Bendale to provide any needed testimony in San Diego, where she resides. In fact, Dr. Bendale explained that her current employer is unlikely to allow her leave to attend a trial for her former employer. (*Id.*)

Another possible witnesses is Mr. C. Joseph Farahmandi, Maxwell's former Director of Research and Development and a named inventor of the two U.S. Patents listed as prior art in Maxwell's Answer to NessCap's Complaint. (Answer, D.I. 7 ¶¶ 18-19.) Mr. Farahmandi is a named inventor on nearly half of Maxwell's patents relating to capacitor and ultracapacitor technology, including Maxwell patents that are prior art to

10

the NessCap '544 patent asserted in this case.  (Balanson Decl. ¶ 9.)  Because of his

knowledge of the accused products in this case and because of his knowledge of the

Maxwell prior art patents, Mr. Farahmandi is likely to be a witness on both the issues of

infringement and invalidity.

Mr. Farahmandi is no longer employed by Maxwell.  (Balanson Decl. ¶ 9.)  He is

currently the President of Ionix Power Systems, LLC, a small company located in San

Diego.  (Kramer Decl., Ex. 8.)  Counsel for Maxwell spoke with Mr. Farahmandi about

testifying in the San Diego and Delaware litigations.  Mr. Farahmandi explained that he

is too busy to participate in the litigation.  (Kramer Decl. ¶ 10.)

### 2. The Location of the Parties and Their Records Weighs in Favor of Transfer.

The management, marketing, and design personnel associated with the accused

ultracapacitors are located in the Southern District of California.  (Balanson Decl. ¶ 13.)

While the location of party witnesses does not carry the same weight as that of non-party

witnesses for transfer analysis, the fact that nearly all U.S.-based material witnesses to

this dispute reside in San Diego tips the scale in favor of transfer.  *See Dippold-Harmon*

*Enters. v. Lowe's Cos.*, C.A. No. 01-532 GMS, 2001 U.S. Dist. LEXIS 18547 at *20 (D.

Del. Nov. 13, 2001) (attached hereto as Ex. A) ("[A]ll the material witnesses in this

dispute, party or otherwise, will be in North Carolina already to litigate the first-filed

action.  Requiring that they then come to Delaware to litigate this action separately

cannot be considered convenient and in the interest of justice.  Accordingly, the court

finds that this factor also weighs in favor of transferring the action to North Carolina.")

(emphasis added).

The few witnesses in this case who do not reside in the Southern District of

California are the Maxwell witnesses who reside in Switzerland and the NessCap

witnesses who presumably reside in South Korea.  The Swiss inventors are certain to be

witnesses in the San Diego action because they are named inventors of one of the two

11

patents in suit, and they are likely to be witnesses in this action because although NessCap's complaint does not identify the accused products in this case with any degree of particularity, its press release describing this lawsuit identifies Maxwell's "D cell line of Boostcap® ultracapacitors" as some of the infringing products. (Kramer Decl., Ex. 1.) The "D cell line of Boostcap® ultracapacitors" was invented by a team of Maxwell employees based in Switzerland. (Gallay Decl. ¶¶ 2, 7; Schneuwly Decl. ¶¶ 2, 7.) Those Swiss inventors travel to San Diego regularly as part of their Maxwell job responsibilities. (Gallay Decl. ¶ 4; Schneuwly Decl. ¶ 4.) Those same inventors never travel to Delaware for any reason. It would be substantially more convenient for the Swiss witnesses to coordinate their San Diego business responsibilities with their San Diego court testimony, than to make separate trips to the United States for the sole purpose of testifying in Delaware. (Gallay Decl. ¶ 9; Schneuwly Decl. ¶ 9.)

At this point, NessCap has not identified any potential witnesses. However, since NessCap "is a company located only in South Korea and organized under Korean law" and "has no offices in the United States, is not registered to do business anywhere in the United States, and has no registered agents in the United States," its witnesses are presumably only located in South Korea. (Kramer Decl., Ex. 2 at 1.) While South Korea is far from both the Southern District of California and the District of Delaware, travel considerations make San Diego more convenient. When factoring in time zone differences and travel time, compared to Philadelphia International Airport, it takes six fewer hours to get to San Diego International Airport from Seoul, South Korea.

Regarding the location of records, nearly all records regarding the accused devices are located in San Diego, including exemplars of the ultracapacitors that will be shown to the jurors. (Balanson Decl. ¶ 13.) No records are located in Delaware. While technological advances have lessened the significance of this factor in the transfer analysis, it is nevertheless a factor that courts consider when balancing convenience of the parties and witnesses. *See, e.g.*, *3Com Corp. v. D-Link Sys., Inc.*, C.A. No. 03-014

12

GMS, 2003 U.S. Dist. LEXIS 7120 at *5 (D. Del. Apr. 25, 2003) ( attached hereto as Ex. B) ("Neither party has any books, records, or other documents in this district. Apparently, none of the acts related to the development of the accused products occurred in this district, while many, if not all, of these acts occurred in California. Clearly, litigating this case there would cause less disruption to business operations of each corporation, while eliminating the cost and time of cross-country transportation of persons and documents.").

**3.    NessCap's Choice of Forum is Entitled to Little Deference Because NessCap Has No Connection to This Forum.**

When a plaintiff selects a forum other than its "home turf," less deference is given to the plaintiff's choice of forum. *See generally Affymetrix*, 28 F. Supp. 2d at 198-200; *see also Burroughs Wellcome Co. v. Giant Food, Inc.*, 392 F. Supp. 761, 763 (D. Del. 1975) (Stapleton, J.) ("Where the forum selected by plaintiff is connected neither with the plaintiff nor with the subject matter of the lawsuit, meeting the burden of showing sufficient inconvenience to tip the 'balance' of convenience 'strongly in favor of defendant' will ordinarily be less difficult."). Applying Judge Stapleton's two-part "home turf" test to this case, NessCap's choice of forum is entitled to less deference because the District of Delaware has no connection with NessCap or the subject matter of this lawsuit. NessCap has proclaimed to the San Diego court that it "has no offices in the United States, is not registered to do business anywhere in the United States, and has no registered agents in the United States." (Kramer Decl., Ex. 2 at 1.) With no contacts in the United States, Delaware cannot be said to be NessCap's "home turf."

In addition, the District of Delaware has no connection with the subject matter of this lawsuit. Maxwell has not sold a single ultracapacitor in the State of Delaware. (Balanson Decl. ¶ 5.) Maxwell has no employees, facilities, or operations in the State of Delaware. (Balanson Decl. ¶ 13.) The same is presumably true for NessCap. With no connection to the State of Delaware, NessCap's choice of forum is entitled to less

13

deference. *See, e.g.*, *Bayer Bioscience N.V. v. Monsanto Co.*, C.A. No. 03-023 GMS, 2003 U.S. Dist. LEXIS 4594 at *6 (D. Del. March 25, 2003) (attached hereto as Ex. C) (noting that "while the defendant is a Delaware entity, and should reasonably expect to litigate in this forum, there is little connection between Delaware and this action or the parties"); *Allergan, Inc. v. Alcon Labs.*, C.A. No. 02-1682-GMS, 2003 U.S. Dist. LEXIS 2564 at *5 (D. Del. Feb. 25, 2003) (attached hereto as Ex. D) (granting transfer and noting "there is little connection between Delaware and this action or the parties").

> **D.    The Public Interests Factors Weigh Heavily in Favor of Transfer.**

The public interests factors outlined in *Jumara* that are relevant to this particular transfer analysis include: (1) practical considerations making trial easy, expeditious, or inexpensive; (2) administrative difficulties posed by the relative congestion of the two dockets in the respective fora; and (3) any local interest in deciding local controversies at home. *Jumara*, 55 F.3d at 879.[3]

> **1.    Trying This Case Along With The First-Filed California Case Will Be More Efficient and Less Expensive Because the Southern District of California Will Have Already Invested Significant Time and Resources in Learning the Technology of the '544 Patent.**

By the time this motion is fully briefed, Judge Houston will have invested time learning the ultracapacitor technology, construing the asserted claims of the patents-in-suit, studying any prior art asserted by NessCap, and considering Maxwell's 261-page motion for a preliminary injunction. Judge Houston is already familiar with the parties in this action, having already considered a number of motions in the San Diego action.

---

[3]    The other two factors – the ability of the Court to enforce the judgment and the public policies of the fora – do not favor either party. Both parties concede personal jurisdiction in both San Diego and Delaware. In addition, the District of Delaware and the Southern District of California, as a matter of public policy, share the same interest in applying the United States patent laws.

14

In contrast, this Court has invested no time or resources in this case. While this Court is amply qualified to familiarize itself with the ultracapacitor technology and patent issues, transfer is appropriate because it would be inefficient for two different courts to get "up to speed" on the same subject matter, the same parties, the same witnesses, and the same legal issues.[4]

### 2. The Case Handling Statistics for the Southern District of California Indicate That It Can Resolve This Matter Quickly.

The next public interest factor, the administrative difficulties posed by the relative congestion of the dockets in the respective fora, weighs in favor of transfer. *See Solomon v. Continental American Life Ins. Co.*, 472 F.2d 1043, 1047 (3d Cir. 1973) (approving consultation of official statistics when evaluating the third public interest factor). Caseload statistics demonstrate that the Southern District of California has a lighter caseload than the District of Delaware. According to statistics published by the Administrative Office of the United States Courts, in the twelve months ending September 30, 2005, there were 463 pending cases per judgeship in Delaware, compared to only 256 in the Southern District of California. (*Compare* Kramer Decl., Ex. 9 with Ex. 10.) While the mix of civil and criminal cases differs between the Southern District of California and Delaware, even the "weighted averages" show a significantly lighter case load in San Diego. Specifically, the Southern District had 387 "weighted filings" in 2005, whereas the District of Delaware had 422. (*Id.*)

---

[4]    A transfer will also improve efficiency because, unlike the San Diego action, the Delaware action necessitates the hiring of local counsel. San Diego-based Maxwell is represented by San Diego lawyers in both the San Diego action and in this case. However, upon being sued in Delaware, Maxwell was required to incur the additional expense of local counsel. *See* D. Del. LR. 83.5(d). The elimination of that added expense counsels in favor of transfer to the Southern District of California. *Affymetrix*, 28 F. Supp. 2d at 206; *3Com Corp.*, 2003 U.S. Dist. LEXIS 7120 at *5 (Ex. B). NessCap already retained a San Diego law firm as its counsel in the San Diego action. Thus, transferring the case to San Diego will not merely shift the burden of obtaining local counsel in Delaware to obtaining local counsel in San Diego.

15

Currently, both this District and the Southern District of California have one judicial vacancy. The case load for the vacant position in the Southern District of California is shared by 12 other district judges, 5 senior judges, and 10 magistrate judges. As this Court knows, the additional workload created by the vacancy in this Court is shared by 3 district judges and 1 magistrate judge.

While this Court has proven its ability to handle a heavy caseload, the *Jumara* analysis requires consideration of this factor, which in this case, favors transfer. *See, e.g., American Sensor Rx, Inc. v. Banner Pharmcaps, Inc.*, C.A. No. 06-1929, 2006 U.S. Dist. LEXIS 66993, at *22 (D.N.J. Sept. 6, 2006) (attached hereto as Ex. E) (transferring case in part because Middle District of North Carolina had a less congested docket with a shorter median time to trial); *Providian Life and Health Ins. Co. v. Cuna Mut. Ins. Soc'y*, No. 96-cv-1797, 1996 U.S. Dist. LEXIS 4109 at *12-13 (E.D. Pa. Mar. 29, 1996) (attached hereto as Ex. F) (granting motion to transfer partly because the Western District of Wisconsin had shorter median times to disposition and trial which would "promote the expeditious resolution of this case"); *cf. Waste Distillation Tech., Inc. v. Pan American Res., Inc.*, 775 F. Supp. 759, 767 (D. Del. 1991) (refusing to transfer in part because the docket of the Central District of California was more congested and therefore the parties would receive a faster disposition of their claims in Delaware).

### 3. Local Interests Do Not Weigh in Favor of Litigating This Action in Delaware.

The Southern District of California has substantial, specific ties to this case, while the District of Delaware has no specific ties. Maxwell was founded in San Diego in 1965 as Maxwell Laboratories and was originally a government contractor providing advanced physics, pulsed power, space effects analysis and other research and development services to the U.S. military and other government agencies. (Balanson Decl. ¶ 3.) For the past two decades, Maxwell, like much of San Diego, has shifted its focus from military and other government applications to commercial, high technology

applications. Maxwell has done all of this from its San Diego headquarters. Today, Maxwell is the United States' largest manufacturer and designer of ultracapacitor products. (Balanson Decl. ¶ 6.)

Companies in the Southern District of California have been among the first to expand the use of ultracapacitor technology. For example, ISE Corporation is a San Diego County-based maker of hybrid-electric drive systems for trucks and buses that began incorporating Maxwell's large-scale ultracapacitors into its drive systems in 2000. (Balanson Decl. ¶ 11.) Another San Diego County-based company, DIG Corp, uses NessCap ultracapacitors in its advanced irrigation products. (Balanson Decl. ¶ 12.) Because Maxwell and NessCap both have customers in the Southern District of California, and because several Southern California companies are on the cutting edge of ultracapacitor use, that district has a stronger interest in resolving this dispute. *See Ikos Sys. v. Cadence Design Sys.*, C.A. No. 02-1335-GMS, 2002 U.S. Dist. LEXIS 20574 at \*5 (D. Del. Oct. 21, 2002) (attached hereto as Ex. G) (noting that "while patent disputes are often not properly characterized as 'local' in nature or otherwise unique to a particular locale, the relevant industry, the Electronic Design Automotive Industry, is apparently located in the Silicon Valley") (citations omitted).

All alleged acts of infringement stem from Maxwell's making and selling of ultracapacitors from San Diego. As described above, Maxwell's more-than-$35 million in ultracapacitor sales does not include a single sale in Delaware. While Maxwell is a Delaware corporation, this general connection to Delaware is insufficient to outweigh the significant, specific ties to the Southern District of California. *Id.* (granting transfer and noting that "while the defendants and the plaintiff are Delaware corporations and should reasonably expect to litigate in the forum, there seems to be little connection between Delaware and this action or the parties"); *Kaiser Indus. Corp. v. Wheeling-Pittsburgh Steel Corp.*, 328 F. Supp. 365, 369 (D. Del. 1971) ("[T]he mere fact that Delaware is the plaintiffs' choice of forum and the defendant's state of incorporation

17

will not, standing alone, prevent this Court from transferring the suit to another forum");

*Quandt v. Beech Aircraft Corporation*, 317 F. Supp. 1009, 1012 (D. Del. 1970)

(plaintiff's choice of forum is not controlling "when the forum chosen is only the

statutory home state of the defendant corporation").

### V.    CONCLUSION

For the foregoing reasons, Maxwell respectfully requests that the Court transfer

this case to the Southern District of California.

Dated: February 6, 2007                YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                         /s/ *Karen E. Keller*
                                         _____
                                         Josy W. Ingersoll (No. 1088)
                                         Karen E. Keller (No. 4489)
                                         1000 West Street
                                         Brandywine Building, 17th Floor
                                         Wilmington, DE 19801
                                         (302) 571-6600
                                         kkeller@ycst.com

                                         MORRISON & FOERSTER LLP
                                         David C. Doyle (CA Bar No. 70690)
                                         Brian M. Kramer (CA Bar No. 201780)
                                         12531 High Bluff Drive, Suite 100
                                         San Diego, CA 92130
                                         (858) 720-5100
                                         ddoyle@mofo.com

                                         *Attorneys for Defendant and Counterclaim Plaintiff*
                                         *Maxwell Technologies, Inc.*

sd-350554

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on February 6, 2007, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Denise Seastone Kraft, Esquire
> EDWARDS ANGELL PALMER & DODGE LLP
> 919 North Market Street
> Suite 1500
> Wilmington, DE 19801
> *dkraft@eapdlaw.com*

I further certify that on February 6, 2007, the foregoing document was served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

> **BY E-MAIL ON FEBRUARY 6, 2007AND**
> **FEDERAL EXPRESS ON FEBRUARY 7, 2007**
>
> George W. Neuner, Esquire
> Brian M. Gaff, Esquire
> EDWARDS ANGELL PALMER & DODGE LLP
> 101 Federal Street
> Boston, MA 02110

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> */s/ Karen E. Keller*
> Karen E. Keller (No. 4489)
> The Brandywine Building, 17th Floor
> 1000 West Street
> Wilmington, DE 19801
> 302-571-6600
> *kkeller@ycst.com*

# EXHIBIT A

LEXSEE


Cited
As of: Feb 06, 2007

**DIPPOLD-HARMON ENTERPRISES, INC., Plaintiff, v. LOWE'S COMPANIES, INC., Defendant.**

**C.A. No. 01-532 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2001 U.S. Dist. LEXIS 18547**

**November 13, 2001, Decided**

**DISPOSITION:** [*1] Defendant's motion to dismiss for lack of personal jurisdiction was denied. Defendant's alternative motion to transfer action to Western District of North Carolina was granted.

**COUNSEL:** For DIPPOLD-HARMON ENTERPRISES INC., plaintiff: William J. Wade, Richards, Layton & Finger, Wilmington, DE.

For LOWE'S COMPANIES INC, defendant: W. Harding Drane, Jr., Leonard S. Togman, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On May 23, 2001, Lowe's Home Centers, Inc. ("Home Centers"), filed a complaint against the defendant Dippold-Harmon Enterprises, Inc. ("Dippld-Harmon") in the General Court of Justice, Superior Court Division, located in North Carolina. On July 27, 2001, Dippold-Harmon removed that action to the United States District Court for the Western District of North Carolina. On August 8, 2001, Dippold-Harmon filed the above-captioned action against Lowe's Companies, Inc.

("Lowe's"), the parent corporation of Home Centers, in Delaware.

Before the court is Lowe's' motion to dismiss, or alternatively, to transfer this case to the Western [*2] District of North Carolina, or to stay this case pending the outcome of that litigation. Lowe's argues that the court should dismiss this action because the court lacks personal jurisdiction over it. It further argues that, should the court not dismiss this action, the case should be transferred to North Carolina pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a). For the reasons that follow, the court will deny Lowe's motion to dismiss for lack of personal jurisdiction, but will grant Lowe's motion to transfer.

**II. BACKGROUND**

Dippold-Harmon is a Delaware corporation, with its principle place of business in Delaware. Lowe's is a North Carolina corporation with its principal place of business in North Carolina. It is the world's second largest home improvement retailer, serving more than five million customers weekly. Lowe's maintains that it is not, and has never been, registered or qualified to do business in Delaware. It further asserts that it does not have a registered agent for the service of process in Delaware.

Home Centers is a wholly-owned subsidiary corporation of Lowe's. It is a North Carolina corporation registered to conduct [*3] business in Delaware, although its principle place of business is in North Carolina. Lowe's maintains significant control over its subsidiary. Lowe's sends its corporate representatives to its retail stores, including Home Centers, and then directs the stores to

take certain actions in accordance with Lowe's policies. Other Lowe's high-level executives admit that they "supervise" and "oversee" the retail stores and travel to these stores on almost a daily basis. Furthermore, in Lowe's advertising materials, it proudly announces that *it* has more than six-hundred and fifty store in forty states, including four in Delaware. In actuality, the four stores in Delaware are its subsidiary Home Centers.

On April 3, 1998, Home Centers entered into a written contract with Dippold-Harmon. The contract specified that Dippold-Harmon would install granite countertops for Home Centers' customers. In approximately 1998, Lowe's also hired Dippold-Harmon as a vendor for the sale and installation of granite kitchen countertops. At that time, Dippold-Harmon was one of several vendors that Lowe's utilized for the installation of these countertops. As Lowe's continued to open additional stores, it was [*4] faced with the costly proposition of installing countertop displays at each of these new stores. To ensure that the countertop displays were properly installed in a uniform manner, Lowe's representatives sought to hire a single vendor to install these displays. It also sought to hire a single vendor to install countertops for its individual customers.

Dippold-Harmon maintains that the parties engaged in subsequent telephone negotiations aimed at making Dippold-Harmon the exclusive vendor for the installation of Lowe's countertop displays, as well as for countertops it sold to individual customers. Some of these discussions were initiated by Lowe's and were directed to Dippold-Harmon in Delaware. At a December 20, 1999 meeting with Dippold-Harmon, Lowe's executives Michael Gettler and Tammy Edson purportedly offered to make Dippold-Harmon its exclusive national vendor for the installation of granite countertops. Dippold-Harmon contends that, during the meeting, it accepted Lowe's' offer and entered into an oral "Exclusivity Agreement." The two companies also exchanged numerous letters and e-mails during this time concerning their vendor agreement.

On May 23, 2001, Home Centers filed [*5]  the North Carolina complaint against Dippold-Harmon. In its complaint, Home Centers alleges that Dippold-Harmon breached their April 3, 1998 written contract. Specifically, Home Centers contended that Dippold-Harmon failed to comply with their written contract's standards in the installation of countertops in the homes of individual customers.

Dippold-Harmon filed this action against Lowe's on August 8, 2001, alleging that Lowe's breached their Exclusivity Agreement and acted fraudulently and with bad faith.

Because the court concludes that exercising personal jurisdiction over Lowe's in this instance comports with traditional notions of fair play and substantial justice as required by the Due Process Clause, and that Lowe's falls within the reach of Delaware's long-arm statute, the court will deny Lowe's' motion to dismiss. *See International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945);* DEL. CODE. ANN. tit. 10 § 3104(c)(2001). However, because the "balance of convenience" tips in favor of Lowe's, the court will grant its motion to transfer.

### III. DISCUSSION

A. Jurisdiction

The essence of Lowe's' argument is that, since it [*6] has not purposefully directed its activities to Delaware, the assertion of personal jurisdiction by the courts of this forum would violate the Due Process Clause. Lowe's further contends that its activities do not bring it within the reach of Delaware's long-arm statute. While Lowe's correctly frames the inquiry the court must make, the court disagrees with its analysis and reaches a different conclusion.

1. Due Process

The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe 326 U.S. at 316* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1940)).* In order to give nonresidents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* [*7] In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).* Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed. Cir. 1994).*

Lowe's argues that its only contacts with Delaware are through Dippold-Harmon, which is a Delaware corporation. Specifically, Lowes' contends that its Home

Centers contract with a Delaware corporation is, by itself, an insufficient basis to establish personal jurisdiction. The court agrees. See *Blue Ball Properties, Inc. v. McClain*, 658 F. Supp. 1310, 1316-17 (D. Del. 1987). However, the court finds that Lowe's has many more purposeful contacts with Delaware than it discloses [*8] in its brief.

First, with regard to the Exclusivity Agreement in issue, Lowe's communicated regularly with Dippold-Harmon by sending numerous letters and e-mails from North Carolina to Delaware. It also placed telephone calls to Dippold-Harmon in Delaware. These contacts alone would be sufficient to satisfy the minimum contacts analysis. See *Hide Power and Equip. Co. v. Strates Enters., Inc.*, 1993 Del. Super. LEXIS 210, WL 258701, at *1 (Del. Super. June 15, 1993) (finding jurisdiction over a nonresident defendant based on a single visit to Delaware and two or three letters sent to Delaware); see also *Mid-Atlantic Mach. & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.*, 492 A.2d 250, 255 (Del. Super. 1985) (extending jurisdiction over a nonresident defendant where the negotiation and execution of the contract occurred entirely outside of Delaware, and the defendant's contacts with Delaware were limited to "an unspecified number of trips.")

However, in addition to these direct contacts with Dippold-Harmon in Delaware, Lowe's is the world's second largest home improvement retailer. This fact alone would provide a sufficient basis for the court to seriously question the legitimacy of Lowe's' [*9] position. However, as previously noted, Lowe's has a wholly-owned subsidiary; that subsidiary, Home Centers, is registered to do business in Delaware, and operates four stores in this jurisdiction. Neither in its advertising material, nor in its internal communications, does Lowe's distinguish between its corporate stores and Home Centers stores. In fact, Lowe's announces the opening of new Home Centers stores as new *Lowe's* locations. Lowe's also maintains strict control over its Home Centers operations. It sends its representatives to the Home Centers stores and then directs those stores not in compliance with Lowe's policies to take certain actions to come into compliance. Such representatives have visited the Delaware stores. Lowe's also publicly admits to otherwise "supervising and overseeing" its stores, and sending Lowe's personnel to those stores, including Delaware locations.

These facts support the conclusion that Lowe's should reasonably have anticipated being brought into court here. However, due process requires that the court make one more inquiry.

Notwithstanding the existence of Lowe's purposeful minimum contacts with this forum, the court must consider whether [*10] the "minimum requirements inherent in the concept of 'fair play and substantial justice. . .'defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court*, 480 U.S. 102, 116, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum. See *Beverly Hills Fan*, 21 F.3d at 1568.

Here, the answer is plainly, no. Delaware has an interest in this action. Dippold-Harmon is a Delaware corporation. Clearly this forum's interests extend to corporate citizens that have sought the protection of Delaware's laws. Moreover, Delaware has an interest in addressing those purposeful activities conducted within its borders that result in allegations of injury. That interest extends to breaches of contract, such as that alleged here. Finally, Lowe's clearly has, through its Home Centers subsidiaries, significantly more than [*11] minimal contacts with this forum. Accordingly, the court concludes that the burden on Lowe's is not so onerous as to run afoul of traditional notions of fair play and substantial justice.

2. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Lowe's to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. See DEL. CODE. ANN. tit. 10 § 3104 (2001). While Lowe's contends that it does not fall within the grasp of any of Section 3104's provisions, Dippold-Harmon contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c)(2001). The court will interpret this language broadly, as [*12] reaching the "maximum parameters of the due process clause." See *Jeffrys v. Exten*, 784 F. Supp. 146, 151 (D. Del. 1992).

n1 This subsection provides general jurisdiction over the nonresident defendant. See *Mendelson v. Delaware River and Bay Auth.*, 56 F. Supp. 2d 436, 439 (D. Del. 1999). Accord-

ingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above, Lowe's directed telephone calls and numerous items of correspondence to Delaware in relation to the disputed Exclusivity Agreement. Through its wholly-owned subsidiary, Home Centers, Lowe's also operated, maintained, and directly supervised four stores in Delaware. Finally, Lowe's has not in any way publicly differentiated itself from the Home Centers locations in Delaware. Consequently, it cannot now complain that it should not be sued here.

Finding sufficient contacts to subject Lowe's to personal jurisdiction under both the State's long-arm statute and the Due Process [*13] Clause, the court will now move to a discussion of whether this action should be transferred to the Western District of North Carolina. n2

n2 In its motion to dismiss, Lowe's also alleges that this action should be dismissed for lack of venue and insufficient service of process. However, both of these claims are based solely on its argument that the court lacked personal jurisdiction. As the court has found personal jurisdiction, these arguments too must fail.

B. Venue

As previously noted, Lowe's seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a).

1. The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania, 850 F.2d 969, 971-72 (3d Cir. 1988).* As its name implies, the rule generally provides that a later-filed action should be stayed pending the [*14] resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc., 769 F. Supp. 169, 171 (E.D. Pa. 1991).*

While Dippold-Harmon does not dispute that the North Carolina action was filed first, it argues that this rule should not apply to the present case because different parties and different issues are presented in the Delaware and North Carolina actions. The court finds this argument unpersuasive. First, Dippold-Harmon itself aggressively argued that Lowe's and Home Centers should be considered one and the same party for purposes of establishing personal jurisdiction. The court will not now find that Lowe's and Home Centers are different

parties for the purposes of the "first-filed" rule. For the reasons stated in Section A.1, *supra*, the court is satisfied that Lowe's and Home Centers are effectively the same party.

Second, with regard to Dippold-Harmon's argument that different issues are presented in the Delaware and North Carolina actions, the court again disagrees. The North Carolina action concerns the breach of a written agreement between Home Centers and Dippold-Harmon. [*15] The written agreement provided that Dippold-Harmon would install granite countertops for its customers in a certain fashion. The Delaware action concerns the breach of an alleged oral agreement between Lowe's and Dippold-Harmon. This alleged oral agreement provided that Dippold-Harmon would be the exclusive distributor of those granite countertops. Both actions thus concern different facets of the same business relationship between the parties. Specifically, both actions relate to Dippold-Harmon's status as a fabricator and installer of granite countertops for Lowe's and Home Centers' customers. A decision by the North Carolina court on the validity, or breach, of the written agreement will bear directly on the alleged oral agreement concerning the same type of services. To have two separate trials on these issues would defeat the purposes of the "first-filed" rule, namely sound judicial administration and comity among federal courts of equal rank. *See EEOC, 850 F.2d at 971.* Accordingly, the court finds that the application of this rule weighs heavily in favor of transferring this case to North Carolina.

2. Section 1404(a)

Transfer to North Carolina is also mandated [*16] under a section 1404(a) analysis. Section 1404(a) provides that "for the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). The parties agree that this action could have been filed in the Western District of North Carolina as a diversity action. The court will, therefore, move on with the inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).*

In *Jumara*, the Third Circuit provided a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court should consider. *See id.*

a. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by

2001 U.S. Dist. LEXIS 18547, *

their relative physical and financial position; (2) the convenience of the witnesses, but only to [*17] the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum. n3 *See id.*

n3 For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 197-201 (D. Del. 1998).* In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See 28 U.S.C. § 1404*(a).

### 1. The Convenience of the Parties

Physically, [*18] North Carolina is moderately inconvenient for Dippold-Harmon, which is headquartered in Delaware. Thus, in order to litigate this matter in North Carolina, it must travel several hours. However, modern communication and transportation capabilities make this moderate journey far less burdensome than it would have been at one time. *See Beverly Hills Fan, 21 F.3d at 1569* (noting that it is not unduly burdensome for a defendant organized under the laws of the People's Republic of China to litigate in Virginia.). Because it is a national distributor of granite and stone kitchen fixtures, Dippold-Harmon is also financially capable of shouldering this burden. As such, it is doubtful that litigating in North Carolina would be an undue financial burden.

Furthermore, transfer to North Carolina would reduce the overall inconvenience to all parties involved. Dippold-Harmon must already travel to North Carolina to defend itself in the first-filed action pending in the Western District of North Carolina. Bringing witnesses and relevant documents to only one location, here North Carolina, minimizes the level of disruption caused to both parties by the litigation. This is certainly [*19] a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time.

### 2. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymetrix, 28 F. Supp. 2d at 203.* Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well-compensated for their attendance, labor and inconvenience, if any. *See id.* (internal citations omitted). Fact witnesses who posses first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

Dippold-Harmon argues that Lowe's has failed to demonstrate that transfer to North Carolina would be more [*20] convenient for potential non-party fact witnesses. The court agrees, and notes that Lowe's' bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor. However, all the material witnesses in this dispute, party or otherwise, will be in North Carolina already to litigate the first-filed action. Requiring that they then come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. Accordingly, the court finds that this factor also weighs in favor of transferring the action to North Carolina.

### 3. The Location of Records and Other Documents

The technological advances of recent year have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id. at 205.* Furthermore, the relevant documents will already be in North Carolina for the litigation of the first-filed action. The court thus sees no need to require that Lowe's, Home Centers, and Dippold-Harmon move the same documents from North Carolina to Delaware. Rather, it would be much more efficient to litigate these related actions in one location.

### b. The Public Factors

As other courts [*21] have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id. at 205.* The court thus elects to discuss only the three factors which the parties deem relevant to the pending case.

### 1. Practical Considerations Making Trial Easy, Expeditious, or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by Lowe's, and accepted by the court, in Section 2.B, *supra*. As such, the court declines

to further address this issue here, since it has already taken this argument into consideration.

### 2. Delaware's Interest in Deciding This Action

Dippold-Harmon claims that Delaware has a far stronger interest in resolving this action since Dippold-Harmon is a Delaware corporation. While the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the alleged Exclusivity Agreement as a local controversy unique to Delaware. *See* *Affymetrix*, 28 F. Supp. 2d at 207. Instead, this alleged agreement concerns Dippold-Harmon's status [*22] as Lowe's' exclusive, national distributor. By its very nature then, the agreement is not local and unique to only Delaware, but rather, affects every state included in the alleged Exclusivity Agreement. Furthermore, the court notes that Dippold-Harmon appears to concede that the alleged Exclusivity Agreement was not formed in Delaware and would not be governed by Delaware law. Accordingly, this factor does not weigh in favor of denying Lowe's motion to transfer.

### 3. Collective Travel Time and Cost

The final public interest factor identified by Lowe's concerns the time and cost allegedly associated with the potential witnesses' travel time to Delaware. This factor, however, duplicates other factors necessary to the court's transfer analysis, namely the private factors considering the convenience and availability of witnesses and the location of documents. The court has already rejected these arguments in its earlier discussion of the "private" factors in the "balance of convenience" analysis.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that Lowe's is subject to personal jurisdiction in Delaware, however, the "balance of convenience" tips strongly in favor [*23] of transferring this action to the Western District of North Carolina.

For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

> 1. Lowe's motion to dismiss for lack of personal jurisdiction (D.I. 8) is DENIED, and Lowe's alternative motion to transfer this action to the Western District of North Carolina (D.I. 8) is GRANTED; and

> 2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Western District of North Carolina.

Dated: November 13, 2001

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

LEXSEE

3COM CORPORATION, Plaintiff v. D-LINK SYSTEMS, INC., Defendant.

C.A. No. 03-014 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 7120

April 25, 2003, Decided

**DISPOSITION:** [*1] Defendant's motion to transfer case to United States District Court for Northern District of California granted.

**COUNSEL:** For 3COM Corporation, PLAINTIFF: John W Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For D-Link Systems Inc, DEFENDANT: John G Day, Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For D-Link Systems Inc, COUNTER-CLAIMANT: John G Day, Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For 3COM Corporation, COUNTER-DEFENDANT: John W Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On January 7, 2003, the plaintiff, 3Com Corporation ("3Com") filed the instant action alleging infringement of three patents relating to network interface adapters. The defendant, D-Link Systems, Inc. ("D-Link"), moves to transfer this case to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) (D.I. 11). For the following reasons, the court will grant the defendant's motion.

### II. DISCUSSION

D-Link moves to [*2] transfer this action to the District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "for convenience of [the] parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is the movant's burden to establish the need for transfer, and 'the plaintiff's choice of venue [will] not be lightly disturbed.' *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995) (citations omitted).

When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.' *Id.* This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interest of justice, but all relevant factors, including certain private and public interests. *Id.* at 875, 879. These private interests include the plaintiff's choice of forum; the [*3] defendant's preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be produced in the alternative forum. n1 *Id.* at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.* at 879-80 (citations omitted).

N1 The first three of these private interest collapse into other portions of the *Jumara* analysis. The court, therefore, will consider them in the context of the entire inquiry only. *See Affymetrix,*

2003 U.S. Dist. LEXIS 7120, *

*Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc.*, 28 F. Supp. 2d 192 (D. Del. 1998).

Upon consideration of these factors, the court finds that D-Link has met its burden of demonstrating that transfer [*4] is appropriate. First, it is clear that this case could have been brought in the Northern District of California. Any federal district court possesses subject matter jurisdiction over federal patent law claims such as those at issue in the present action. 28 U.S.C. § § 1331and 1338. Further, venue is proper in the Northern District of California because the defendant is a California corporation with its sole place of business in that state. 28 U.S.C. § 1400(b) ("Any civil action for patent infringement may be brought in the judicial district where the defendant resides ....").

Having determined that the case could be properly heard in the Northern District of California, the court now considers whether it would more conveniently proceed in that forum and whether the interest of justice supports a transfer to that district. Again, the court finds that these criteria are met. First, the court notes that although 3Com is a Delaware corporation, its principal place of business is in Santa Clara, California. D-Link is a California corporation with its sole place of business in Irvine, California. Although some of D-Link's products, including [*5] the accused products, are sold in Delaware, the connection to this forum ends there. Neither 3Com nor D-link maintains or owns any facility, property, or personnel in Delaware. Instead, the headquarters of both parties are located in California. Neither party has any books, records, or other documents in this district. Apparently, none of the acts related to the development of the accused products occurred in this district, while many, if not all, of these acts occurred in California. Clearly, litigating this case there would cause less disruption to business operations of each corporation, while eliminating the cost and time of cross-country transportation of persons and documents. In addition, D-Link was forced to retain local counsel for purposes of litigating in this district. Were the case transferred to California, this additional expense would not be required.

In addition, none of the anticipated third-party witnesses is subject to compulsory process in Delaware, but they may be compelled to testify in the Northern District of California. These witnesses include individuals involved in the development of the accused products, such as employees of the manufacturers of the products, [*6] Realtek Semiconductor Corp. ("Realtek") and Via Tech-

nologies, Inc. ("Via"). Realtek and Via are Taiwanese companies with offices and/or agents in northern California. Futhermore, at least one of the inventors of the accused products and one of the prosecuting attorneys could not be compelled to testify in this court. By contrast, each appears to live in northern California, and would be subject to compulsory process there. Finally, at least two witnesses with knowledge of allegedly invalidating prior art are subject to compulsory process in northern California, but not Delaware. Even if these witnesses were willing to travel to Delaware to testify in this court, it is certainly very inconvenient for them to do so, especially compared to traveling to a court in the state of their residence and employment. Convenience, cost, and expediency, then, favor a transfer.

The remaining factors of court congestion, the enforceability of the judgment, and the public polices of the fora neither favor nor counsel against transfer. These factors remain neutral in the court's analysis.

### III. CONCLUSION

In short, Delaware seems to have little interest in the present dispute between these [*7] parties, while justice, convenience, cost, and expediency favor a forum in California. The court recognizes that the Northern District of California is not the plaintiff's choice of forum for the present action; however, it is an exceedingly more convenient and appropriate forum than Delaware. In other words, the movant has shown that 'the litigation would more conveniently proceed and the interest of justice be better served by transfer' to California. *Jumara*, 55 F.3d at 879 (citations omitted). As such, transfer is appropriate.

For the aforementioned reasons, IT IS HEREBY ORDERED that:

> 1. The defendant's Motion to Transfer the case to the United States District Court for the Northern District of California (D.I. 11) is GRANTED.

Dated: April 25, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT C

LEXSEE

**BAYER BIOSCIENCE N.V., Plaintiff, v. MONSANTO COMPANY, Defendant.**

**C.A. No. 03-023 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2003 U.S. Dist. LEXIS 4594**

**March 25, 2003, Decided**

**DISPOSITION:** [*1] Motion to transfer case granted.

**COUNSEL:** For BAYER BIOSCIENCE N V, plaintiff: George Pazuniak, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For MONSANTO COMPANY, defendant: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For MONSANTO COMPANY, counter-claimant: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For BAYER BIOSCIENCE N V, counter-defendant: George Pazuniak, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

## MEMORANDUM AND ORDER

## I. INTRODUCTION

On January 10, 2003, the plaintiff, Bayer Bioscience, N.V. ("Bayer"), filed the above-captioned action alleging that Monsanto Company ("Monsanto") is engaging in activity that infringes Bayer's U.S. Patent No. 5,659,123 ("the '123 patent").

Presently before the court is Monsanto's motion to transfer the case to the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). For the following reasons, the court will grant this motion. [*2]

## II. BACKGROUND

Bayer is a foreign corporation headquartered in Ghent, Belgium. Monsanto is a Delaware corporation, with its headquarters in St. Louis, Missouri.

The patent at issue involves a corn product that has been genetically modified to express a particular "Bt" gene that makes the corn resistant to a type of Coleopteran insect known as the corn rootworm. For the past two years, Monsanto and Bayer have been engaged in litigation in the Eastern District of Missouri regarding four other patents assigned to Bayer. Those four patents all generally relate to crops genetically engineered with a "Bt gene," purportedly rendering the crops toxic to a class of insects known as Lepidopteran insects.

On December 27, 2002, the Missouri District Court issued a summary judgment order finding that all four of the patents-in-suit in that case were unenforceable due to inequitable conduct. On January 10, 2003, Bayer filed the present action. Also on January 10, 2003, Monsanto filed a declaratory judgment action for noninfringement in the Missouri District Court.

## III. DISCUSSION

### A. The "First-Filed" Rule

Where two patent lawsuits involving the same claims are filed in [*3] different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances. *See Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993). The first-filed doctrine also serves to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters. *See id.* at 937.

Applying the first-filed rule, Bayer now argues that it would be improper for the court to transfer this first-filed action to the Eastern District of Missouri. While the

2003 U.S. Dist. LEXIS 4594, *

court does not dispute that this action is first-filed, albeit only by several hours, for the following reasons, the court concludes that the 1404(a) factors nevertheless weigh in favor of litigating this dispute in Missouri. *See id.* at 937-38 (noting that "the trial court's discretion tempers the preference for the first-filed suit, when such preference should yield to the forum in which all interests are best served.").

**B. Section 1404(a)**

Section 1404(a) provides that "for the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer [*4] this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). Bayer suggests that the Eastern District of Missouri may not have personal jurisdiction over it. n1 Importantly, however, Bayer fails to suggest that it could not have originally brought this action in Missouri, rather than in Delaware. Thus, because Bayer could have brought this action in the proposed transferee district, the court will move on with the inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995).

n1 As it is not the court's province to determine the question of another court's personal jurisdiction, the court expresses no opinion on this issue.

When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.' *Id.* This inquiry requires "a multi-factor balancing test" [*5] embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id.* at 875, 879. These private interests include the plaintiff's choice of forum; the defendants' preference; whether the claim arose elsewhere; and the location of books and records, to the extent that they could not be produced in the alternative forum. n2 *Id.* at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.* at 879-80 (citations omitted).

n2 The first three of these private interest collapse into other portions of the *Jumara* analysis. The court, therefore, will consider them in the context of the entire inquiry only. *See Affymetrix, Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc.,* 28 F. Supp. 2d 192 (D. Del. 1998).

[*6]

Upon consideration of these factors, the court finds that Monsanto has met its burden of demonstrating that transfer is appropriate. In reaching this conclusion, the court relied on the following considerations, among others: (1) while the defendant is a Delaware entity, and should reasonably expect to litigate in this forum, there is little connection between Delaware and this action or the parties; (2) no party maintains operations in Delaware; (3) the parties are large and international organizations with substantial assets; (4) because the parties are litigating apparently related issues in Missouri, travel time and convenience in the aggregate would be substantially increased with a transfer of forum; and (5) any disparity in court congestion is not so great as to weigh against transfer due to the "mirror image" action currently pending in the Eastern District of Missouri. Thus, given the ongoing relationship that the Eastern District of Missouri has with the same parties, and the same, or related, patent or patents, the court concludes that the public and private interests are sufficient to tip the balance of convenience strongly in favor of transfer.

**IV. CONCLUSION** [*7]

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. Bayer's Motion for Leave to File a Sur-Reply (D.I. 10) is GRANTED as unopposed.

2. Monsanto's Motion to Transfer this case (D.I. 5) is GRANTED.

3. The above-captioned action is hereby TRANSFERRED to the United States District Court for the Eastern District of Missouri.

Dated: March 25, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT D

LEXSEE

**ALLERGAN, INC. and ALLERGAN SALES, LLC, Plaintiffs, v. ALCON LABORATORIES, INC., ALCON RESEARCH LTD., ALCON INC., and BAUSCH & LOMB, INC., Defendants.**

**C.A. No. 02-1682-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2003 U.S. Dist. LEXIS 2564**

**February 25, 2003, Decided**

**DISPOSITION:** [*1] Defendants' motion to transfer this case granted.

**COUNSEL:** For ALLERGAN INC., ALLERGAN SALES LLC, plaintiffs: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE.

For ALCON LABORATORIES, INCORPORATED, ALCON RESEARCH LTD., ALCON INC., defendants: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For BAUSCH & LOMB INC., defendant: Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On December 16, 2002, the plaintiffs, Allergan, Inc. and Allergan Sales, LLC (collectively "Allergan"), filed the above-captioned action seeking a declaratory judgment against the defendants, Alcon Laboratories, Inc., Alcon Research, Ltd., Alcon, Inc., and Bausch & Lomb, Inc. (collectively "Alcon and B&L"). Specifically, Allergan asserts infringement of its U.S. Patent No. 6,465,464 B2 ("the '464 Patent"). The '464 Patent is based on a continuation application of two Allergan patents asserted in a prior California action.

Presently before the court is Alcon and B&L's motion to transfer this action to the Central District [*2] of California, Southern Division. For the reasons that follow, the court will grant this motion.

**II. BACKGROUND**

Both of the plaintiffs are Delaware entities with their principle place of business in Irvine, California. The defendant Alcon Laboratories, Inc. is a Delaware corporation with its principal place of business in Forth Worth, Texas. Alcon Research, Ltd. is a limited partnership organized under the laws of Texas, with Alcon Laboratories, Inc. as a general partner. Alcon, Inc. is the parent of Alcon Laboratories, and is a Swiss corporation headquartered in Hunenberg, Switzerland. Finally, Bausch and Lomb is a New York corporation, with its principle place of business in Rochester, New York.

On January 9, 2002, Allergan filed suit against Alcon and B&L in the Central District of California asserting infringement of United States Patent Nos. 6,199,415 B1 ("the '415 Patent") and 6,248,741 B1 ("the '741 Patent"). Alcon moved for summary judgment of noninfringement, which the court granted on May 8, 2002. See _Allergan, Inc. v. Alcon Laboratories, Inc.,_ 200 F. Supp. 2d 1219 (C.D. Cal. 2002). B&L subsequently filed a similar motion, which was also granted. [*3]

On October 15, 2002, Allergan obtained the '464 patent, which issued as a continuation of the application that led to the '741 patent, which, in turn, is a continuation of the application that led to the '415 patent. The '464 patent is the subject of the current action.

The defendants in the present case filed a "mirror image" declaratory judgment action against Allergan concerning the '464 patent in the Central District of California on December 23, 2002.

### III. DISCUSSION

Alcon and B&L move to transfer this action to the District Court for the Central District of California, Southern Division pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "for convenience of [the] parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). The parties do not dispute that this action could have been filed in the Central District of California, Southern Division. The court will, therefore, move on with the inquiry as directed by the Third Circuit. See *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995). [*4]

When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice would be better served by transfer to a different forum.' *Id.* This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id.* at 875, 879. These private interests include the plaintiff's choice of forum; the defendants' preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be produced in the alternative forum. n1 *Id.* at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.* at 879-80 (citations omitted).

    n1 The first three of these private interest collapse into other portions of the *Jumara* analysis. The court, therefore, will consider them in the context of the entire inquiry only. See *Affymetrix, Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc.,* 28 F. Supp. 2d 192 (D. Del. 1998).

[*5]

Upon consideration of these factors, the court finds that the defendants have met their burden of demonstrating that transfer is appropriate. In reaching this conclusion, the court relied on the following considerations, among others: (1) while the plaintiffs and several of the defendants are Delaware entities, and should reasonably expect to litigate in the forum, there is little connection between Delaware and this action or the parties; (2) each party either maintains its principle place of business in California, or has facilities there, whereas no party maintains operations in Delaware; (3) the parties are large and international organizations with apparently substantial assets; (4) because the parties are already litigating essentially the same issues in California, travel time and convenience in the aggregate would be substantially increased with a transfer of forum; and (5) any disparity in court congestion is not so great as to weigh against transfer due to the defendants' "mirror image" action currently pending in the Central District of California, Southern Division. Thus, given the on-going relationship the Central District of California has with the same parties, and [*6] the same, or related, patents, the court concludes that the public and private interests are sufficient to tip the balance of convenience strongly in favor of the defendants.

### III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:

> 1. The defendants' motion to transfer this case (D.I. 6) is GRANTED.

> 2. The above-captioned action is hereby TRANSFERRED to the United States District Court for the Central District of California, Southern Division.

Dated: February 25, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT E

LEXSEE

**AMERICAN SENSOR RX, INC., Plaintiff, v. BANNER PHARMCAPS, INC., Defendant.**

**Civil Action No. 06-1929 (FSH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2006 U.S. Dist. LEXIS 66993**

**September 6, 2006, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**COUNSEL:** For AMERICAN SENSOR, INC., Plaintiff:BRIAN R ADE, TIMOTHY BOYD PARLIN, RIVKIN RADLER LLP, SUMMIT, NJ US.

For BANNER PHARMACAPS, INC., Defendant, Counter Claimant: STEPHEN L DREYFUSS, HELLRING LINDEMAN GOLDSTEIN & SIEGAL, NEWARK, NJ.

For AMERICAN SENSOR, INC., Counter Defendant: BRIAN R ADE, RIVKIN RADLER LLP, SUMMIT, NJ US.

**JUDGES:** HON. FAITH S. HOCHBERG, U.S.D.J.

**OPINION BY:** FAITH S. HOCHBERG

**OPINION: HOCHBERG, District Judge**

## I. INTRODUCTION

This matter is before the Court on Defendant's Cross-Motion to Transfer the Case Pursuant to 28 U.S.C. § 1404(a) to the Middle District of North Carolina. The Court has made its determination after considering the written submissions of the parties and without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons set forth below, the Defendant's Cross-Motion to Transfer the Case to the Middle District of North Carolina is granted.

## II. FACTUAL BACKGROUND

Plaintiff American SensoRx, Inc. ("SensoRx") is a New Jersey corporation with its principal place of business in Glen Rock, New Jersey. Plaintiff designs, develops, and [*2]  implements high speed inspection systems

to analyze numerous objects simultaneously and to identify microscopic flaws or deviations in certain products. A component of SensoRx's inspection system is a rejection device to separate and segregate those product items which fail to meet the pre-determined product specifications. Defendant Banner Pharmcaps, Inc. ("Banner") is a Delaware Corporation with its principal place of business located in High Point, North Carolina, which is located in the Middle District of North Carolina. Banner manufactures healthcare products, including soft gelatin capsules. On March 24, 2005, Plaintiff SensoRx made a written offer to design and manufacture a complete inspection system ("Inspection System") which met Defendant Banner's needs entitled "Rental Agreement for American SensoRx InspectRx Vision System" ("Agreement"). The Agreement indicated that the initial rental period would be three months, and at the end of this period, Banner would either purchase the system for the agreed price, extend the rental to another plan for the agreed time and price, or return the system to SensoRx. In the Agreement, Plaintiff promised to "refund 100% of the money paid [*3]  to them for the system" if the system did not meet the requirements set forth in the Agreement. See Agreement at p. 2. On March 31, Defendant Banner signed the Agreement in North Carolina.

On April 7, 2005, SensoRx requested Banner to pay a deposit of $ 45,000.00 toward the three-month rental price set forth in the Agreement. Banner paid this amount, and in late May 2005, SensoRx shipped the Inspection System to Banner in North Carolina. On June 11, 2005, Dr. Sabrie Solomon, president of SensoRx, traveled to North Carolina to install the Inspection System at Banner's facility. In its Answer, Defenses, and Counterclaim ("Counterclaim"), Defendant Banner alleged that although Solomon and his assistant attempted to install and bring the Inspection system on-line during June and July, it would not work properly. See Counterclaim at P 17-19. By August 2005, Banner determined

that the Inspection System would not operate as promised and requested the return of its $ 45,000 pursuant to SensoRx's "100% Money-Back Guarantee." Banner offered to return the Inspection System back to SensoRx. Banner alleges that SensoRx refused to return the deposit or provide shipping information for Banner [*4]  to return the Inspection System. *See* Counterclaim at P 21-22. In December 2005, Plaintiff provided the necessary shipping information, and Banner returned the Inspection System around December 12, 2005. *See* Counterclaim at P 23.

Plaintiff SensoRx filed a complaint in the Superior Court of New Jersey, Law Division, Bergen County on March 10, 2006 alleging claims of Breach of Contract, Unjust Enrichment, Quantum Meruit, Unpaid Expenses ("Account Stated/Book Account"), and Damage to Property. Defendant Banner removed the matter to this court on April 26, 2006. On May 3, 2006, Banner filed its Answer, Defenses, and Counterclaim. Banner's Counterclaims include Breach of Contract, Conversion, Fraud, Unfair and Deceptive Acts and Practices, and Breach of Implied Covenant of Good Faith and Fair Dealing. On May 23, 2006, SensoRx filed its Motion to Dismiss Counts 2-5 of Banner's Counterclaim. n1 On June 26, 2006 Banner brought this Cross-Motion to Transfer this matter from the U.S. District Court for the District of New Jersey to the U.S. District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1404(a). Plaintiff filed a Memorandum of [*5]  Law In Opposition to Defendant's Cross-Motion to Transfer ("Plaintiff's Reply") on July 17, 2006, and Defendant filed a Memorandum of Law in Reply to Opposition to Banner's Cross-Motion to Transfer on July 24, 2006.

n1 This Court takes no position on any of the issues raised in the Plaintiff's Motion to Dismiss Counts 2-5 of Banner's Counterclaims. Throughout this Opinion, the Court discusses the Defendant's counterclaims in the context of this Cross-Motion to transfer. However, this Court's discussion of these counterclaims does not represent any opinion on whether they belong in the case.

## III. ANALYSIS

### A. Standard of Review under 28 U.S.C. § 1404(a)

28 U.S.C. § 1404(a) provides that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The goal of § 1404(a) is to prevent the "waste of 'time, energy, and [*6]  money' and 'to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" *See Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964). The moving party bears the burden of establishing that a court should grant a transfer and must give the court "adequate data of record" in support of its position. *See Tischio v. Bontex, Inc.,* 16 F.Supp.2d 511, 520 (D.N.J. 1998).

The movant must first show that the transferee court is one where the matter could have originally been brought. *See, e.g., Shutte v. Armco Steel Corp.,* 431 F.2d 22, 24 (3d Cir. 1970), *Sandvik, Inc. v. Continental Ins. Co.,* 724 F.Supp. 303, 306 n.7 (D.N.J. 1989), and *CIBC World Markets, Inc. v. Deutsch Bank Securities, Inc.,* 309 F.Supp. 2d 637, 644 (D.N.J. 2004). Although § 1404(a) only specifically mentions the convenience of the parties, the convenience of the witnesses, and the interests of justices, the transfer analysis is not limited to these three factors. The court must more broadly consider the private interests of the litigants and the public interest in fair and efficient administration of justice when [*7]  making its decision. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509, 67 S. Ct. 839, 91 L. Ed. 1055 (1947). n2 The Third Circuit has developed representative issues to consider when analyzing the private interest and the public interest. *See Jumara v. State Farm Insurance Company,* 55 F.3d 873, 879 (3d Cir. 1995). The private interests include plaintiff's preferred forum, defendant's preferred forum, whether the claims arose in a forum other than the forum selected by the plaintiff, the physical and financial condition of the parties, and the relative ease of access to the sources of proof, including witnesses, books, and records. *Id.* The public interests recognized by the Third Circuit include the judge's familiarity with the applicable state law, the local interest in adjudicating disputes at home, court congestion in the two fora, the public policies of the forum, the burden of jury duty on the citizens of the state with a greater interest in the dispute, and the opportunity for the fact finder to view the location of the dispute. *Id.* The analysis, however, should not be limited to these factors, and factors may have different relevance in particular cases. *See* [*8]  *Van Cauwenberghe v. Biard,* 486 U.S. 517, 528-529, 108 S. Ct. 1945, 100 L. Ed. 2d 517 (1988). A court's decision to transfer should consider "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara,* 55 F.3d at 879.

n2 The Court noted that the private interest factors are: (1) plaintiff's choice of forum, (2) the relative ease of access to sources of proof, (3) the availability and cost of compulsory process for

unwilling witnesses, (4) obstacles to a fair trial, (5) the possibility of viewing any necessary premises, and (6) all other factors relating to the expeditious and efficient adjudication of the dispute. *Id.* The public interest factors are: (1) the relative backlog and other administrative difficulties in the two jurisdictions, (2) the fairness of placing the burdens of jury duty on the citizens of the state with the greater interest in the dispute, (3) the local interest in adjudicating localized disputes; and (4) the appropriateness of having the jurisdiction whose law will govern adjudicate the dispute in order to avoid difficult problems in conflicts of laws. *Id.* Although *Gulf Oil* articulated these factors in the context of a motion to dismiss for *forum non conveniens,* courts routinely look to the *Gulf Oil* factors in deciding a motion to transfer venue under § 1404. *See, e.g., National Property Investors VIII v. Shell Oil Company,* 917 F. Supp. 324, 326 (D.N.J. 1995)

[*9]

## B. This Matter Could Have Been Brought in the Middle District of North Carolina

The initial analysis under a § 1404(a) motion requires the court to determine whether the subject matter jurisdiction, personal jurisdiction, and venue in the transferee court are valid. *See CIBC,* 309 F.Supp. 2d at 644 (D.N.J. 2004). First, subject matter jurisdiction is valid under 28 U.S.C. § 1332: Plaintiff is a New Jersey corporation with its principal place of business in New Jersey, Banner is a Delaware corporation with its principal place of business in North Carolina, and both the complaint and the counterclaim allege an amount in controversy exceeding the $ 75,000 requirement. Second, personal jurisdiction is also valid for both Plaintiff and Defendant. Because Banner's principal place of business is in the Middle District of North Carolina, the court would have personal jurisdiction over Banner. As well, the court would have personal jurisdiction over SensoRx because it entered into a contract that was executed in North Carolina, sent numerous communications to North Carolina, had officers and employees travel to North Carolina, attempted to [*10] implement and perform the Agreement in North Carolina, and signed documents in North Carolina acknowledging that the product would perform in a certain way. Last, venue is appropriate in the Middle District of North Carolina because Defendant's principal place of business in High Point, North Carolina is located in the district. In its opposition to Defendant's Motion to Transfer, Plaintiff concedes that venue would be proper in the Middle District of North Carolina and that the court would have subject matter and personal jurisdiction over the parties in this matter. *See* Plaintiff's Reply at 16.

## C. The Private Interests of the Litigants Favor Transfer of this Matter to North Carolina

### 1. Choice of Forum

The Third Circuit has recognized that a plaintiff's choice of forum is a "paramount concern" in deciding a § 1404(a) transfer request. *Shutte,* 431 F.2d at 25. *See also, e.g., Tischio,* 16 F.Supp.2d at 521 and *Park Inn Int'l, v. Moody Enter.,* 105 F.Supp. 2d 370, 377 (D.N.J. 2000). Further, when the plaintiff has chosen its home state as the forum, that decision is "entitled to greater deference." *Piper Aircraft v. Reyno,* 454 U.S. 235, 255, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981). [*11] However, where the central facts of the lawsuit occur outside of the forum state, the plaintiff's selection is entitled to less deference. *See, e.g., National Property Investors III,* 917 F. Supp. at 327 (holding that "the Court does not accord great weight to Plaintiff's choice of New Jersey as the forum in which to bring this action, because New Jersey has a tangential relationship to the facts underlying Plaintiff's claims") *citing S.C. Johnson & Son v. Gillette Co.,* 571 F.Supp. 1185, 1188 (N.D. Ill. 1983) (stating that "as a general rule, the preferred forum is that which is the center of gravity of the accused activity") and *Ricoh Co.,* 817 F.Supp. at 481. Because the central facts of this lawsuit occur outside of New Jersey--and indeed in the district where the Defendant moves to transfer this case--Plaintiff's selection is entitled to less deference.

Almost all, if not all, of the central facts of this lawsuit occur in North Carolina, outside of the forum state of New Jersey. In determining where the central facts of a lawsuit occurred, courts look at where the cause of action arose. *See NPR, Inc. v. Am. Int'l Ins. Co.,* 2001 U.S. Dist. LEXIS 3463, 2001 WL 294077 [*12] (D.N.J. March 28, 2001). In a breach of contract action for the failure of goods to perform correctly, a cause of action arises where the contract was supposed to be performed. *See Thorlabs, Inc. v. Townsend Communs., L.L.C.,* 2004 U.S. Dist. LEXIS 14200, 2004 WL 1630488, *4 (D.N.J. June 30, 2004). The Agreement in this case involves the Plaintiff's manufacturing of a piece of equipment that was supposed to be delivered, installed, FDA-validated, and operate in North Carolina. n3 As well, the Plaintiff was supposed to train Banner personnel in North Carolina; if the inspection system needed any maintenance, the Plaintiff would send someone to North Carolina to perform the repair; and Defendant's refusal to make any additional payments, which the Plaintiff claims breached the Agreement, occurred at the Defendant's office in North Carolina. As well, Defendant bases its tort claims on Plaintiff's "100% Money-Back Guarantee," which

Plaintiff sent to North Carolina. *See CIBC,* 309 F. Supp. 2d at 648. Therefore, the Plaintiff's choice of forum will be given less deference because the central facts of this lawsuit occur outside of New Jersey.

> n3 Plaintiff does not dispute that the Agreement was required to be performed in North Carolina nor that the Agreement called for the Plaintiff to deliver and install the Inspection System in North Carolina.

[*13]

2. Physical and Financial Condition of the Parties

Both parties--self described as leaders in their fields--appear to have sufficient resources to litigate this case outside their choice forum. Although Plaintiff describes itself as a "local company" and as the David in a self-proclaimed "David. v. Goliath" match in its 5/24/06 Motion to Dismiss Counts 2-5 of Defendant's Counterclaim, this does not appear to be the case. For example, on its website, Plaintiff describes itself as a "world leader" in developing automated systems and represents that it has sold systems around the world, including in Korea and Japan. As well, because Plaintiff describes itself as a company that tailors each machine to the individual needs of the client, presumably its employees travel frequently. In its Opposition to Defendant's Cross-Motion to Transfer, Plaintiff argues that its "limited resources" will be "stretched to the limit in order to support the added expenses inherent in out-of-state litigation." *See* Soloman Affidavit at P 6. Plaintiff, however, has not produced any documentation to support this claim. Although Plaintiff may be marginally less able to fund litigation in North Carolina [*14]  than Defendant is to in New Jersey, the evidence does not support that Plaintiff's financial circumstances are so dire as to prevent transfer. *NPR, Inc.,* 2001 U.S. Dist. LEXIS 3463, [WL] at *5. Therefore, this is a neutral element in the private interest analysis.

3. Relative East of Access to the Sources of Proof, Including Witnesses, Books, and Records

Based upon the parties' submissions, the location of non-party witnesses supports a transfer of this case to North Carolina. Banner asserts that numerous witnesses would be required to testify in this litigation and that they would not be willing to travel voluntarily to New Jersey. Defendant provided four affidavits from employees involved in the installation of the Inspection System who would not be willing to travel to New Jersey voluntarily and who do not normally travel for their jobs: Robert D. Greiner, a process engineer at Banner who was

involved in the installation of the Inspection System, the preparation of the FDA-required validation study which accompanied the Inspection System, and numerous communications with Dr. Solomon, Plaintiff's president, before Banner entered into the Agreement; Lisa Zoppo, Senior [*15]  Manager for Quality Assurances at Banner who was involved with the validation study of the Inspection System; Jay Krueger, manager of the Post-Production Department at Banner in 2005, which is the department where the system was installed; and Katrina Roberts, a Validation Engineer for Banner who was involved in numerous communications with SensoRx personnel before and during the time when they came to North Carolina to install the inspection system as well as the validation study. *See* Attachments 2-5 of Defendant's Cross-Motion to Transfer. As well, Jay Krueger swore in his affidavit that there were at least four associates in his department who were trained on the Inspection System. All of these witnesses are necessary to testify on the performance of the Inspection System.

On the other hand, Plaintiff's primary witness, Dr. Soloman, is already a frequent traveler for business who flew down to North Carolina on numerous occasions regarding the Inspection System. In its Reply, Plaintiff argues that it will rely upon the testimony of "two key non-party witness" employed at Ackley Machine Corporation ("Ackley"), a company that supplied Banner with the Inspection System, in order [*16]  to counter Banner's contention that the Inspection System never worked properly. However, Plaintiff did not submit any affidavits from either individual, and therefore there is no reliable evidence as to what they may testify about. n4 Moreover, there is no evidence that either individual participated in the negotiation of the Agreement or even saw the Inspection System prepared by the Plaintiff. Further, there is no evidence that either witness refuses to travel to North Carolina. Therefore, the location of non-party witnesses supports a transfer of this case to North Carolina.

> n4 Dr. Soloman's affidavit says that "I am informed by counsel that at trial, SensoRx, will rely upon the testimony of two individuals who are not employees." *See* Soloman Affidavit at P 7. This Court, however, cannot simply rely on this statement alone. *See Fowler v. Borough of Westville,* 97 F.Supp. 2d 602, 607 (D.N.J. 2000) (holding that the Court would not consider statements in an affidavit that are not based on the declarant's personal knowledge or that contained inadmissible hearsay).

[*17]

**D. The Public Interests of the Litigants Favor Transfer of this Matter to North Carolina**

1. Forum's Familiarity with the Applicable Law

A federal court with diversity jurisdiction must apply the choice of law principles of the forum state. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496-97, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Because North Carolina law applies to both parties' breach of contract claims as well as to the Defendant's fraud tort claim, this factor favors a transfer to the Middle District of North Carolina.

Under New Jersey law, the governing law in a contract case is that of the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties. *See, e.g., Keil v. National Westminster Bank,* 311 N.J. Super. 473, 710 A.2d 563, 569 (App. Div. 1998) and *Gilbert Spruance v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 134 N.J. 96, 102-103, 629 A.2d 885 (1993). To determine which states have more significant contacts, New Jersey courts look to issues such as (a) the place of contract; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and [*18] (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See National Utility Service v. Chesapeake Corp.,* 45 F. Supp. 2d 438, 447 (D.N.J. 1999). However, there is a presumption that the law of the place of contract and the place of performance should apply, absent some dominant and significant relationship with another state, because "the law of the place of contract generally comport[s] with the reasonable expectations of the parties' concerning the applicable and controlling legal principles." *Id., citing Keil,* 710 A.2d at 569. Applying these factors, North Carolina law should govern the contract. Banner initially solicited SensoRx with a telephone call and electronic mailings from North Carolina, and the contract was created in North Carolina. As well, the Agreement was performed in North Carolina because Plaintiff installed the Inspection System in banner's North Carolina facilities. Because "[j]ustice requires that, whenever possible, a diversity case should be decided by the court most familiar with the applicable state law," this factor supports transferring the case to North Carolina. n5 [*19] *See NCR Credit Corp. v. Ye Seekers Horizon, Inc.,* 17 F.Supp.2d 317, 323 (D.N.J. 1998).

n5 In its Reply to Plaintiff's Opposition to its Cross-Motion to Transfer, Defendant also highlights that there is a conflict in law in the application of the parol evidence rule under North Carolina and New Jersey law. However, because under New Jersey law the governing law in a contract case is that of the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties, this Court will not discuss this issue.

For tort claims, New Jersey has rejected the traditional rule of lex loci delicti and instead applies a flexible governmental interest analysis requiring application of the law of the state with the greatest interest in resolving the particular issue. *See, e.g., Gantes v. Kason Corp.,* 145 N.J. 478, 484, 679 A.2d 106 (1996) and *Marks v. Struble,* 347 F.Supp.2d 136, 142 (D.N.J. 2004). The court must perform its analysis on an issue-by-issue [*20] basis, which may result in the court applying different states' laws to different issues in the same litigation. *See Robeson Industries Corp. v. Hartford Accident & Indemnity Co.,* 178 F.3d 160, 168 (3d Cir. 1999). The first step in the governmental interest analysis requires the court to determine whether an actual conflict exists between the laws of the interested states. *Marks,* 347 F.Supp.2d at 142. If there is no conflict, the court must apply the law of the forum state. *Prima v. Darden Restaurants, Inc.* 78 F.Supp.2d 337, 345 (D.N.J. 2000). In this case, Defendant has alleged tort claims of conversion, fraud, and unfair and deceptive practices. A conflict exists between North Carolina law and New Jersey law on the burden of proof required to maintain a claim for fraud because North Carolina requires a preponderance of the evidence and New Jersey requires clear and convincing evidence. *Compare Manufacturers' Oil & Grease Co. v. Averett,* 192 N.C. 465, 135 S.E. 298 (1926) ("On the issue of fraud, the burden is on the [the party asserting the claim] to satisfy the jury of fraud by the greater weight of the evidence or a preponderance [*21] of the evidence."), *Maurer v. SlickEdit, Inc.,* 2006 NCBC LEXIS 1, 2006 WL 269954 at *9 (N.C. Super. February 3, 2006) ("Fraud must be proven by preponderance of evidence"), and *Oliver v. Hecht,* 207 N.C. 481, 486, 177 S.E. 399, (1934) with *Lithuanian Commerce Corp. v. Sara Lee Hosiery,* 214 F.Supp. 2d 453, 458 (D.N.J. 2002) (noting that New Jersey law requires fraud to be proven by a clear and convincing standard of proof). Defendant also argues that because Banner's unfair and deceptive trade practices claim is based in large part on its claim for fraud, the application of North Carolina law to Banner's fraud claim would necessitate the application of North Carolina law to Banner's unfair and deceptive trade practices claim, *citing Hardy v. Toler,* 288 N.C. 303, 311, 218 S.E.2d 342 (1975). *See* Defendant's Cross-Motion to Transfer at 21. Plaintiff does not specifically address this argument in its Reply. Even without considering the unfair and deceptive trade practices claim, this Court finds that because both parties' breach of contract claim as well

as the fraud tort claim are under North Carolina law, the forum's familiarity with the applicable law cuts in favor [*22] of transferring this case to the Middle District of North Carolina.

2. Relative Court Congestion

Although relative court congestion is not the most important factor in a § 1401(a) analysis, *see Park Inn Int'l*, 105 F.Supp.2d at 378, the Middle District of North Carolina has fewer cases than the District of New Jersey. According to the official U.S. Courts website, for the 12-month period ending March 31, 2005, New Jersey had 5,442 cases with the median time interval to reach trial being 27 months and the Middle District of North Carolina had 734 cases with the median time interval of 20 months to reach trial. *See* Defendant's Cross-Motion to Transfer, Exhibit 2. Therefore, although not given much weight, this issue favors transfer as well.

3. Local Interest and Nexus to the Controversy

North Carolina's local interest and nexus to the controversy also favor transferring the case to the Middle District of North Carolina. The District of New Jersey has recognized that "North Carolina has a significant interest in adjudicating disputes arising from events occurring within its borders." *National Property Investors VIII*, 917 F.Supp. at 330 (D.N.J. 1995). [*23] North Carolina has strong interest in adjudicating claims having to do with an alleged breach of contract where the contract was created in North Carolina. As well, as explained in detail above, the contract was to be fulfilled in North Carolina, where the Inspection System was installed. New Jersey should not be burdened with adjudi-

cating a dispute which arose out of a contract entered into in North Carolina and which inflicted damage on a North Carolina corporation. *See Gulf Oil*, 330 U.S. at 508-9.

**IV. CONCLUSION**

For the reasons stated herein, the Cross-Motion to Transfer this matter from the U.S. District Court for the District of New Jersey to the U.S. District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1404(a) is **GRANTED.** An appropriate order will issue.

/s/ **HON. FAITH S. HOCHBERG, U.S.D.J.**

**ORDER**

**HOCHBERG, District Judge**

This matter having come before the Court upon Defendant's Cross-Motion to Transfer the Case Pursuant to 28 U.S.C. § 1404(a) to the Middle District of North Carolina, and

After considering the written submissions by [*24] the parties pursuant to Fed. R. Civ. P. 78, and for the reasons stated in the opinion accompanying this order,

it is on this 6th day of September, 2006

**ORDERED** that Defendant's motion is **GRANTED;** and it is further,

**ORDERED** that this case is **TRANSFERRED** to the Middle District of North Carolina.

/s/ **HON. FAITH S. HOCHBERG, U.S.D.J.**

# EXHIBIT F

LEXSEE

**PROVIDIAN LIFE AND HEALTH INSURANCE COMPANY, ET AL. V. CUNA MUTUAL INSURANCE SOCIETY, ET AL.**

**CIVIL ACTION NO. 96-1797**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1996 U.S. Dist. LEXIS 4109**

**March 29, 1996, Decided**
**March 29, 1996, FILED, ENTERED**

**COUNSEL:** [*1] For PROVIDIAN LIFE AND HEALTH INSURANCE COMPANY, NATIONAL LIBERTY CORPORATION, PLAINTIFFS: JAMES J. ROHN, [COR LD NTC], PATRICIA M. HAMILL, [COR LD NTC], CONRAD, O'BRIEN, GELLMAN & ROHN, PHILA, PA.

For CUNA MUTUAL INSURANCE SOCIETY, MEMBERS LIFE INSURANCE COMPANY, CUNA MUTUAL INVESTMENT CORPORATION, CENTURY LIFE OF AMERICA, CENTURY LIFE INSURANCE COMPANY, DEFENDANTS: IAN A. L. STROGATZ, [COR NTC], PHILA, PA.

**JUDGES:** JUDGE CLARENCE C. NEWCOMER

**OPINION BY:** CLARENCE C. NEWCOMER

**OPINION: MEMORANDUM**

Presently before the Court are defendants' Motion pursuant to 28 U.S.C. § 1404(a) to Transfer Venue to the Western District of Wisconsin, plaintiffs' response thereto, and defendants' reply memorandum. For the reasons that follow, this Court will grant defendants' motion.

I. Background

This case stems from the termination of a joint venture agreement relating to the sale of "insurance products." Plaintiffs are the Providian Life and Health Insurance Company ("Providian") and National Liberty Corporation ("National Liberty"). Plaintiffs both maintain their principal places of business in Frazer, Pennsylvania, which is located within this judicial district.

The five named defendants [*2] are the CUNA Mutual Insurance Society ("CUNA Mutual"), MEMBERS Life Insurance Company ("MEMBERS"), the CUNA Mutual Investment Corporation, Century Life of America, and Century Life Insurance Company. According to the complaint, CUNA Mutual is the sole parent and owner of CUNA Mutual Investment Society, which wholly owns MEMBERS. CUNA Mutual, CUNA Mutual Investment Society and MEMBERS are all incorporated in Wisconsin and maintain their principal places of business in Madison, Wisconsin. The remaining two defendants, Century Life of America and Century Life Insurance Company, are incorporated in Iowa and maintain their principal places of business in Waverly, Iowa, which is approximately 200 miles from Madison, Wisconsin.

The facts as alleged in the amended complaint are as follows. In May 1983, plaintiffs, through their predecessors, National Home Life Assurance Co. and National Liberty Marketing, entered into a joint venture agreement ("the Agreement") with defendant CUNA Mutual, CUDIS Insurance Society (the former name of MEMBERS), and League Life Insurance Company (a predecessor of MEMBERS). Plaintiffs' area of expertise involved the "direct response marketing" of life, accident [*3] and health insurance. Direct response marketing involves solicitation of customers via telephone, direct mail, and media advertising. Additionally, plaintiffs had developed specialized techniques and data management systems to target specific groups of consumers and to track various aspects of their marketing and sales. Defendants' area of expertise pertained to the marketing of various insurance products to credit unions. The parties formed the joint venture in order to jointly market life, accident and health insurance products to credit union members. Subsequently, defendant Century Life Insur-

ance Company and its parent, Century Life of America, became involved in the joint venture.

The joint venture developed numerous marketing lists containing the names and addresses of various credit union members. In addition, the joint venture developed various confidential data systems, formulae and programs to maintain lists of current and former customers. The lists containing the names of approximately 21 million previous and current customers are known as "the Namebank." Plaintiffs assert that the Namebank is one of the most valuable assets of the joint venture. Since 1989, the Namebank [*4] has been administered and maintained by defendants at their offices. The Agreement also refers to some lists contained in the Namebank data systems as the "Joint Lists." The Joint Lists are valuable because they contain the identities of those credit union customers who have expressed an interest in the insurance products of the joint venture.

The Agreement contains a provision describing the rights and obligations of the parties upon termination of the joint venture. The Agreement provides defendants with three options: (a) purchase plaintiffs' one-half interest in the Joint Lists; (2) rent plaintiffs' one-half interest in the Joint Lists; or (3) elect neither to purchase nor to rent the Joint Lists.

The Agreement also provides that, "even upon termination and regardless of which option the defendants chose, the business developed by the joint venture . . . would continue and be managed by the joint venture parties." Complaint P 42. The parties agreed that, even if one party terminated the Agreement, they would apply best efforts to attain the performance objectives defined in the Agreement, and they agreed not to act to induce cancellation or nonrenewal of Direct Response Insurances. [*5]

In December 1995, defendants terminated the joint venture, electing option (c), which prevented either party from using the Joint Lists for a period of one year. Pursuant to the Agreement, plaintiffs requested an independent audit of the joint venture. The audit team, consisting of three auditors from the public accounting firm Coopers & Lybrand, conducted the audit at defendants' offices in Madison, Wisconsin and Waverly, Iowa in January or early February 1996.

Problems arose during the course of the audit. The audit team found that defendants had commingled many of the joint venture documents with defendants' own documents, and defendants admitted that they were marketing insurance products to credit union members whose names were contained in the joint venture's Namebank data systems. Defendants also obstructed the audit team's access to various important documents.

Following several unsuccessful attempts by the parties to resolve these issues, plaintiffs filed the above-captioned case in this Court. Plaintiffs seek preliminary and permanent injunctions ordering defendants to comply with the audit and prohibiting defendants from using joint venture property, unilaterally marketing [*6] Direct Response Insurances to joint venture customers and converting joint venture business to their own. Plaintiffs also seek an Order creating a constructive trust and directing defendants to provide an accounting and turn over all joint venture property and documents.

Defendants subsequently filed the present Motion to Transfer Venue to the Western District of Wisconsin. Plaintiffs have filed an opposition brief to defendants' motion, and defendants have filed a reply brief. As discussed in more detail infra, this Court will grant the Motion to Transfer Venue.

II. Discussion

Although a district court has broad discretion to decide whether to transfer an action, it is the burden of the moving party to justify the transfer. McClain v. Camouflage Associates, 1994 U.S. Dist. LEXIS 14775, 1994 WL 570874 (E.D. Pa. Oct. 18, 1994); Leonardo da Vinci's Horse, Inc. v. O'Brien, 761 F. Supp. 1222, 1229 (E.D. Pa. 1991). A transfer of venue is proper when (1) the case could have been brought initially in the proposed transferee forum, and (2) the transfer would promote the convenience of the parties and witnesses and would be in the interest of justice. Shutte v. Armco Steel Corp., 431 F.2d 22, [*7] 24-25 (3d Cir. 1970), cert. denied, 401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971).

Plaintiffs do not argue that venue in the Western District of Wisconsin would be improper. In a civil action based on diversity of citizenship, venue is proper in (1) the district where any defendant resides, if all defendants live in the same state or (2) a judicial district where a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. . .. 28 U.S.C. § 1391(a). In this case, venue is proper in the Western District of Wisconsin because three out of the five corporate defendants reside in Wisconsin, and the remaining two defendants reside in Waverly, Iowa, which is only 200 miles from Madison. Moreover, as parts of the uncompleted audit and defendants' alleged conversion of the joint venture property took place in Wisconsin, a substantial part of the events giving rise to plaintiffs' claims occurred in Wisconsin.

Having met their burden of showing that venue would be proper in the Western District of Wisconsin, defendants must show that a transfer would serve "the

1996 U.S. Dist. LEXIS 4109, *

convenience of the parties and witnesses" and "the interests [*8] of justice." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947). In making this determination, this court will examine seven factors:

(1) Plaintiffs' choice of forum.

(2) Relative ease of access to sources of proof.

(3) Availability of compulsory process for attendance of unwilling witnesses.

(4) Cost of obtaining attendance of willing witnesses.

(5) Possibility of viewing premises, if applicable.

(6) All other practical problems that make trial of a case easy, expeditious and inexpensive.

(7) Public interest factors, including the relative congestion of court dockets, choice of law considerations and the relationship of the community in which the courts and jurors are required to serve to the occurrences that give rise to the litigation.

Id. at 508-509.

First, in reviewing a motion to transfer venue under 1404(a), a court must show great deference to a plaintiff's choice of forum. Shutte, 431 F.2d at 25. Unless the balance weighs strongly in favor of the defendant, the plaintiff's choice of forum should not be disturbed. American ackaging Corp. v. Tommy Lasorda Foods Inc., 1988 U.S. Dist. LEXIS 10815, 1988 WL 100735 (E.D. Pa. Sept. 26, 1988). Thus, [*9] this court will defer to plaintiffs' choice of forum unless application of the remaining six factors enumerated in Gulf Oil indicates that transfer would be appropriate.

Applying the second through fifth factors, which pertain to accessibility of sources of proof and witnesses, this Court finds that defendants have met their burden of showing that transfer is warranted. The crux of plaintiffs' case is that defendants improperly interfered with the independent audit, improperly converted the joint venture property, and improperly used the Joint Lists. Since a substantial percentage of the documents subjected to

the audit are located in Wisconsin, with the remaining documents being situated in Iowa, this factor weighs in favor of transfer. Defendants have submitted affidavits stating that documents relating to the Direct Response Department occupy approximately 544 filing cabinet drawers in Madison, Wisconsin, and that thousands more documents and rolls of microfilm are located in Madison or in Waverly, Iowa. See Affidavits of Beth Anderson and Ann Schuetz.

Plaintiffs repeatedly emphasize that a significant portion of the joint venture's marketing activities took place, until [*10] recently, exclusively in Frazer, Pennsylvania. This Court finds this fact to be unpersuasive. All of the allegedly wrongful conduct took place in Wisconsin and Iowa after termination of the Agreement: defendants' conversion of joint venture property, the obstruction of the audit, and the use of the Namebank and Joint Lists. As this Court interprets the allegations in plaintiffs' complaint, the previous marketing activities of the joint venture are simply irrelevant to the issues raised in the present case.

Moreover, because most of the testimony in this case will pertain to defendants' alleged commingling of documents, obstruction of the audit and conversion of the joint venture property, many of the witnesses in this case will be those individuals responsible for maintaining the documents in Wisconsin and Iowa. Defendants report that plaintiffs have noticed depositions of 27 witnesses, 18 of whom are located in Wisconsin, and the remaining 9 of whom are located in Iowa. While it is true that members of the Coopers & Lybrand audit team reside in Philadelphia, that is outweighed by the fact that so many other witnesses reside in Wisconsin and Iowa. Moreover, as defendants note in their [*11] reply brief, Coopers & Lybrand is a national public accounting firm with offices across the United States, yet it made a business decision to send auditors from its Philadelphia office to conduct audits in Wisconsin and Iowa. If the distance between Philadelphia and Wisconsin did not pose an insurmountable problem then, it should not do so now.

Moreover, some witnesses, such as former joint venture employees, are no longer employees of either party to this litigation and may be compelled to testify only via subpoena. Since this Court's subpoena power extends only to a geographic radius of 100 miles, the location of these witnesses is an important factor to consider in determining whether to transfer this case to another district. Plaintiffs contend that approximately twenty former employees of the joint venture continue to reside in or near Chester County, Pennsylvania. Plaintiffs do not, however, state whether these people would testify at trial or describe the nature of any expected testimony. Moreover, in their self-executing disclosures made pursuant to Fed. R. Civ. P. 26(a), plaintiffs identified only four individu-

1996 U.S. Dist. LEXIS 4109, *

als residing in Pennsylvania who are likely to have information [*12] on most issues in this case. Defendants, in contrast, identified more than 27 individuals in Wisconsin or Iowa possessing that information. Furthermore, since many former joint venture employees still reside in or near Madison, Wisconsin, this factor does not tip the balance either way.

Finally, the remaining factors, practical problems and "public interest factors," weigh heavily in favor of transfer. For instance, the Agreement provides for the application of Wisconsin law in the event of a dispute. While this Court is, of course, capable of applying Wisconsin law, a Wisconsin court's familiarity with Wisconsin law will undoubtedly promote efficiency in this case. Rowles v. Hammermill Paper Co., Inc., 689 F. Supp. 494, 497 (E.D. Pa. 1988); L.C. Baron, Inc. v. H.G. Caspari, Inc., 678 F. Supp. 100, 103 (E.D. Pa. 1987). Moreover, due to its uncrowded docket, the Western District of Wisconsin has the fastest median time to disposition and the third fastest median time to trial in civil actions of any federal district court in the country. Defendants' Memorandum of Law in Support of Their Motion to Transfer Venue at 4. Therefore, transfer will promote the expeditious resolution [*13] of this case.

Because defendants have met their burden of showing that transfer of this case under 28 U.S.C. § 1404(a) will promote the interests of justice and the convenience of parties and witnesses, this Court will grant defendants' motion to transfer.

An appropriate Order follows.

Clarence C. Newcomer, J.

IN THE UNITED STATES DISTRICT COURT

**ORDER**

AND NOW, this 29th day of March, 1996, upon consideration of defendants' Motion for Transfer of Venue, plaintiffs' response thereto, and defendants' reply memorandum, it is hereby ORDERED that said Motion is GRANTED. The Clerk of Court is ordered to transfer this case to the Western District of Wisconsin pursuant to 28 U.S.C. § 1404(a).

AND IT IS SO ORDERED.

Clarence C. Newcomer, J.

# EXHIBIT G

LEXSEE

**IKOS SYSTEMS, INC., Plaintiff, v. CADENCE DESIGN SYSTEMS, INC., and QUICK TURN DESIGN SYSTEMS, INC., Defendant.**

**C.A. No. 02-1335-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 20574**

**October 21, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motion to transfer the case granted.

**COUNSEL:** For Ikos Systems Inc, PLAINTIFF: Robert K Payson, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Cadence Design Systems, Inc, Quickturn Design Systems, Inc, DEFENDANTS: Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Cadence Design Systems, Inc, Quickturn Design Systems, Inc, COUNTER-CLAIMANTS: Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Ikos Systems Inc, COUNTER-DEFENDANT: Robert K Payson, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On July 29, 2002, the plaintiff, IKOS Systems, Inc. ("IKOS"), filed the instant action for patent infringement against Cadence Design Systems, Inc. ("Cadence") and Quick Turn Design Systems, Inc. ("Quick Turn") (collectively "the defendants"). IKOS alleges that Quick Turn's Palladium TM design verification product infringes United States Patent No. 5,847,578 ("the '578 patent"). The defendants, move [*2] to transfer this case to the

United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) (D.I. 11). For the following reasons, the court will grant the defendants' motion.

**II. DISCUSSION**

Each of the parties in this case is a Delaware corporation n1 with headquarters located within several miles of one another in what is commonly known as the Silicon Valley of northern California.

> n1 IKOS is a subsidiary of Mentor Graphics Corporation ("Mentor") which is incorporated under the laws of the State of Oregon. The defendants assert that Mentor is the real party in interest in this action. IKOS does not seem to seriously contest this assertion. Nevertheless, given the court's analysis and conclusions as to the most appropriate forum for the litigation of this matter, the court need not reach this issue.

The defendants move to transfer this action to the District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) [*3] . Section 1404(a) provides that "for convenience of [the] parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is the movants' burden to establish the need for transfer, and 'the plaintiff's choice of venue [will] not be lightly disturbed.' *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995) (citations omitted).

When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.' *Id.*. This

inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id.* at 875, 879. These private interests include the plaintiff's choice of forum; the defendants' preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be [*4] produced in the alternative forum. n2 *Id.* at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.* at 879-80 (citations omitted).

> n2 The first three of these private interest collapse into other portions of the *Jumara* analysis. The court, therefore, will consider them in the context of the entire inquiry only. *See Affymetrix, Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc.,* 28 F. Supp. 2d 192 (D. Del. 1998).

Upon consideration of these factors, the court finds that the defendants have met their burden of demonstrating that transfer is appropriate. In reaching this conclusion the court relied on the following considerations, among others: (1) while [*5] the defendants and the plaintiff are Delaware corporations and should reasonably expect to litigate in the forum, there seems to be little connection between Delaware and this action or the parties; (2) each party is headquartered in northern California; (3) the parties are large national and international organizations with apparently substantial assets; (4) because the parties maintain geographically diverse operating locations, travel time and convenience in the aggregate would be neither increased nor decreased substantially with a transfer of forum; (5) any disparity in court congestion is not so great as to justify a transfer of venue; (6) while patent disputes are often not properly characterized as "local" in nature or otherwise unique to a particular locale, *see Affymetrix,* 28 F. Supp. 2d at 207,

the relevant industry, the Electronic Design Automotive Industry, is apparently located in the Silicon Valley. Finally, IKOS has identified six potential witnesses who are not employed by the defendants and reside on the east coast. n3 However, it appears that the majority of the defendants' engineers, as well as other potential witnesses, are located in the Northern [*6] District. Thus, the court is convinced that this fact and the other public and private interests are sufficient to tip "the balance of convenience ... *strongly* in favor of [the] defendant[s]." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir. 1970) (emphasis in original).

> n3 In its brief and an accompanying declaration by Giovanni Mancini, a former employee of the plaintiff, IKOS has identified William R. Beausoleil as a seventh potential non-party employee witness. In his declaration, Mr. Mancini states that the witness elected not to join the defendant, Cadence. In contrast, the defendants offer the declaration of the witness himself. In that declaration, Mr. Beausoleil attests that he entered the employ of Cadence on March 28, 2002. The court will credit Mr. Beausoleil's declaration.

### III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:

> 1. The defendants' motion to transfer the case to the United States District Court for the Northern District [*7] of California (D.I. 11) is GRANTED.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: October 21, 2002