**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NESSCAP CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-764-GMS |
| | ) | |
| MAXWELL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

**MAXWELL TECHNOLOGIES, INC.'S REPLY BRIEF IN SUPPORT OF ITS
MOTION TO TRANSFER VENUE TO THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
PURSUANT TO 28 U.S.C. § 1404(a)**

YOUNG CONAWAY STARGATT & TAYLOR
Josy W. Ingersoll (No. 1088)
Karen E. Keller (No. 4489)
1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19801

P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6689
kkeller@ycst.com

MORRISON & FOERSTER LLP
David C. Doyle (CA Bar No. 70690)
Brian M. Kramer (CA Bar No. 201780)
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
(858) 720-5100
ddoyle@mofo.com

Dated: March 2, 2007    *Attorneys for Defendant Maxwell Technologies, Inc.*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     ARGUMENT ............................................................................................. 2

        A.    A Transfer is Required to Ensure the Personal Attendance of Non-
              Party Witnesses ............................................................................. 2

              1.    Dr. Bendale and Mr. Farahmandi Are the Only Witnesses
                    Who Can Testify Regarding Their Intent, or Lack Thereof,
                    to Willfully Infringe the Patent-in-Suit ...................................... 2

              2.    The San Diego Witnesses Designed a Majority of the
                    Accused Products .................................................................. 4

        B.    The San Diego Action and the Delaware Action Involve the Same
              Technology, and the PTO Classification Differences Are
              Meaningless ................................................................................... 5

        C.    The Balance of Private Interests Tips in Favor of Transfer ................... 8

              1.    The Convenience of the Parties Favors Transfer to the
                    Southern District of California .................................................. 8

              2.    The Convenience of the Witnesses Favors Transfer ................. 10

        D.    The Balance of Public Interests Favors Transfer ............................... 11

              1.    Trying Two Cases Involving the Same Parties and the
                    Same Technology in Two Different Courts is Inefficient ......... 11

              2.    Delaware Has No Local Interest in This Case .......................... 12

              3.    The Lack of Congestion in the Southern District of
                    California Favors Transfer ...................................................... 14

III.    THE SECOND DELAWARE ACTION SHOULD BE DISMISSED .............. 14

IV.     CONCLUSION ........................................................................................ 15

# TABLE OF AUTHORITIES

Page

## CASES

*3Com Corp. v. D-Link Sys., Inc.,*
C.A. No. 03-014-GMS, 2003 U.S. Dist. LEXIS 7120 (D. Del. Apr. 25, 2003) .................9, 13

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,*
265 F.3d 1294 (Fed. Cir. 2001)...................................................................................................3

*Affymetrix, Inc. v. Synteni, Inc.,*
28 F. Supp. 2d 192 (D. Del. 1998) .........................................................................................2, 9

*Allergan, Inc. v. Alcon Labs.,*
C.A. Nos. 02-1682-GMS, 2003 U.S. Dist. LEXIS 2564 (D. Del. Feb. 25,
2003)..............................................................................................................................................9

*Alloc, Inc. v. Unilin Decor N.V.,*
C.A. Nos. 03-253-GMS, 05-857-GMS, 2006 U.S. Dist. LEXIS 78019 (D. Del.
Oct. 26, 2006) .............................................................................................................................9

*Bayer Bioscience N.V. v. Monsanto Co.,*
C.A. No. 03-023-GMS, 2003 U.S. Dist. LEXIS 4594 (D. Del. Mar. 5, 2003)..........................9

*Brunswick Corp. v. Precor, Inc.,*
C.A. No. 00-691-G 2000 U.S. Dist. LEXIS 22222 (D. Del. Dec. 12, 2000) ............................9

*Corixa Corp. v. Idec Pharms. Corp.,*
C.A. No. 01-615-GMS, 2002 U.S. Dist. LEXIS 2980 (D. Del. Feb. 25, 2002) ........................9

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.,*
897 F.2d 508 (Fed. Cir. 1990)...................................................................................................3

*Ikos Sys. v. Cadence Design Sys.,*
C.A. No. 02-1335-GMS, 2002 U.S. Dist. LEXIS 20574 (D. Del. Oct. 21,
2002)...........................................................................................................................................4, 9

*In re Huene,*
No. 99-1514, 2000 U.S. App. LEXIS 19978 (Fed. Cir. August 11, 2000) ...............................6

*In re Mlot-Fijalkowski,*
676 F.2d 666 (C.C.P.A. 1982) ................................................................................................5, 6

*Mentor Graphics Corp. v. Quickturn Design Sys.,*
77 F. Supp. 2d 505 (D. Del. 1999) ...........................................................................................9

# TABLE OF AUTHORITIES
(continued)

Page

*Morgan v. Ward*,
   699 F. Supp. 1025 (N.D.N.Y. 1988) ......................................................................................4

*Orthopedic Equip. Co., Inc. v. United States*,
   702 F.2d 1005 (Fed. Cir. 1983)............................................................................................6

*Pennwalt Corp. v. Purex Industries, Inc.*,
   659 F. Supp. 287 (D. Del. 1986) ..........................................................................................2

*Rolls-Royce Ltd. v. GTE Valeron Corp.*,
   800 F.2d 1101 (Fed. Cir. 1986)............................................................................................3

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
   127 F.3d 1462 (Fed. Cir. 1997)............................................................................................3

*State Indus., Inc. v. A.O. Smith Corp.*,
   751 F.2d 1226 (Fed. Cir. 1985)............................................................................................3

*Truth Hardware Corp. v. Ashland Prods.*,
   C.A. No. 02-1541-GMS, 2003 U.S. Dist. LEXIS 409 (D. Del. Jan. 13, 2003)...........................4

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
   939 F.2d 1540 (Fed. Cir. 1991)............................................................................................3

*Vulcan Eng'g Co. v. FATA Aluminium, Inc.*,
   278 F.3d 1366 (Fed. Cir. 2002)........................................................................................3, 4

*Windsor Shirt Co. v. New Jersey Nat'l Bank*,
   793 F. Supp. 589 (E.D. Pa. 1992) ........................................................................................4

## STATUTES

28 U.S.C. § 1404(a)...........................................................................................................9

35 U.S.C. § 102...............................................................................................................11

Fed. R. Civ. Proc. 12(b)(5) .............................................................................................13

U.S.D.C. District of Delaware Local Rule 7.1.1...................................................................15

## I.     INTRODUCTION

NessCap's basis justifying Delaware as its choice of forum – that Maxwell is a Delaware corporation – does not overcome the inefficiencies associated with two courts resolving the same issues and the fact that the Southern District of California can subpoena non-party witnesses that this Court cannot.  Conducting the trial in San Diego, with live witnesses and an appreciable nexus with the local community, is in the interest of justice.  The parties will save the expense of litigating two lawsuits involving the admittedly same technology – ultracapacitors – on two coasts.

This District has no connection to the sole plaintiff, Korea-based NessCap Co., Ltd. ("LIMITED").  This District likewise has no connection to the ultracapacitor industry.  The Southern District of California, on the other hand, is (1) where most of the accused products were invented and manufactured, and (2) where both parties have customers.

This Court should also transfer the case in the interest of justice so that a single court can keep track of the inconsistent positions that LIMITED is taking in the two lawsuits.  For example, in the San Diego action, LIMITED is arguing that it could not be served with the complaint in Delaware because it has no ties here; but in this case, LIMITED is embracing its American parent corporation's Delaware incorporation to justify its choice of Delaware.  In addition, LIMITED is telling the San Diego court that it "has no presence in the United States;" but in this case, it has filed a declaration of one of its employees stating that he lives in the United States, runs LIMITED's U.S. operations, and would be inconvenienced by a trial outside of Delaware.  LIMITED cannot have it both ways.

## II.    ARGUMENT

### A.    A Transfer is Required to Ensure the Personal Attendance of Non-Party Witnesses.

"It is desirable to hold trial at a place where the personal attendance of witnesses through the use of subpoena power can be reasonably assured." *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 205 (D. Del. 1998) (quoting *Pennwalt Corp. v. Purex Industries, Inc.*, 659 F. Supp. 287, 291 (D. Del. 1986). A trial in the Southern District of California will have far more live witnesses than a trial in Delaware because not a single non-party witness resides within this Court's subpoena power.

Maxwell identified at least two likely non-party witnesses, Dr. Priya Bendale and Mr. Curtis J. Farahmandi, both of whom are high level executives at different San Diego technology companies, and both of whom indicated that they do not want to come to Delaware to testify in this case. (D.I. 15, Kramer Decl. ¶¶ 8-10.) LIMITED presumably contacted each and confirmed that Dr. Bendale and Mr. Farahmandi will not come to Delaware. Instead of challenging the inconvenience to these witnesses or their reluctance to travel to Delaware, LIMITED has tried to downplay their significance in two ways. First, LIMITED focuses solely on the witnesses' capacity to testify on the prior art and ignores the significance of each as an infringement witness, particularly with regard to LIMITED's allegations of willful infringement. (D.I. 1, ¶ 11.) Second, LIMITED uses a truncated quote from the opening brief to argue that the Swiss inventors, as opposed to Dr. Bendale or Mr. Farahmandi, invented the accused products in this case.

### 1.    Dr. Bendale and Mr. Farahmandi Are the Only Witnesses Who Can Testify Regarding Their Intent, or Lack Thereof, to Willfully Infringe the Patent-in-Suit.

Dr. Bendale served as Maxwell's Senior Director of Research & Development, and Mr. Farahmandi served as Technical Director of Research & Development. (D.I. 14, Balanson Decl. ¶¶ 8-9.) Between the two of them, they hold at least 19 Maxwell patents related to ultracapacitor technology and were responsible for design elements of

many of Maxwell's 29 different BOOSTCAP® products on the market today.  (*Id.*)
While expert witnesses may be able to testify regarding whether a particular product
infringes or whether a piece of prior art anticipates, it is well established that percipient
witnesses are required to determine whether infringement was willful.  *See e.g.*, *SRI
Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1465 (Fed. Cir. 1997) (listing
willful infringement factors including "whether there was independent invention or
attempts to design around and avoid the patent or any other factors tending to show good
faith"); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1546 (Fed. Cir. 1991)
(noting that testimony by designer of accused product was important to show absence of
copying in rebutting allegation of willful infringement); *State Indus., Inc. v. A.O. Smith
Corp.*, 751 F.2d 1226, 1237-38 (Fed. Cir. 1985) (absence of copying by designer was
evidence that infringement was not willful); *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800
F.2d 1101, 1109 (Fed. Cir. 1986) (testimony from engineers about attempts to design
around patent and avoid infringement demonstrate an absence of willfulness).  When
determining whether infringement was willful, a jury must assess the defendant's state
of mind.  "Whether an act is 'willful' is by definition a question of the actor's intent. . .
." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1309 (Fed. Cir.
2001) (quoting *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510
(Fed. Cir. 1990)).

       In this case, the jury will have to assess the Maxwell inventors' mental state
when designing and launching the accused BOOSTCAP® products. With regard to Dr.
Bendale, for example, the willful infringement inquiry will ask: (1) Were her
BOOSTCAP® inventions independent efforts? (2) Did she consider LIMITED's patents
or products when designing the BOOSTCAP® products? (3) Did her efforts amount to a
"deliberate disregard for the property rights of the patentee?" *Vulcan Eng'g Co. v. FATA
Aluminium, Inc.*, 278 F.3d 1366, 1378 (Fed. Cir. 2002); and (4) Did she "exercise[] due

care to avoid infringement?" *Id.* The same questions will be asked of Mr. Farahmandi with regard to the BOOSTCAP® elements he designed.

LIMITED argues that instead of having Dr. Bendale and Mr. Farahmandi testify live before a jury in California, their depositions should be videotaped in California and shown to a Delaware jury. But in the context of willfulness, a jury will want to observe the live demeanor of witnesses testifying about "deliberate disregard" and "due care": "The rule in our circuit is clear, . . . since demeanor is best judged by live testimony, live testimony is usually better than videotaped testimony." *Windsor Shirt Co. v. New Jersey Nat'l Bank*, 793 F. Supp. 589, 608 (E.D. Pa. 1992), *aff'd*, 989 F.2d 490 (3d Cir. 1993); *see also Morgan v. Ward*, 699 F. Supp. 1025, 1048 n.33 (N.D.N.Y. 1988) ("It should be noted that in a case like this, where many of the key factual issues turn on the credibility of the witnesses, the inability of the court to observe the deposition witness's demeanor severely hinders its ability to fulfill its fact-finding responsibility.").[1]

### 2. The San Diego Witnesses Designed a Majority of the Accused Products.

LIMITED misleads by repeating three times in its brief that "the accused products in this lawsuit were 'invented by a team of Maxwell employees based in Switzerland.'" (D.I. 23 at 11, 12, and 17.) The full quotation from Maxwell's opening brief reads: "'The D cell line of Boostcap® ultracapacitors' was invented by a team of Maxwell employees based in Switzerland." (D.I. 13 at 12.) The D cell line of BOOSTCAP® ultracapacitors represents only 2 of 29 different BOOSTCAP®

---

[1]     LIMITED cites *Truth Hardware Corp. v. Ashland Prods.*, C.A. No. 02-1541-GMS, 2003 U.S. Dist. LEXIS 409 (D. Del. Jan. 13, 2003), for the proposition that "a flight to Delaware is not an onerous task warranting transfer." (D.I. 23 at 10.) LIMITED ignores that Dr. Bendale and Mr. Farahmandi will not get on a plane to come to Delaware. Moreover, in *Truth Hardware*, the non-party witnesses were not within the subpoena power of either Delaware or the Northern District of Illinois, which was the potential transferee jurisdiction. 2003 U.S. Dist. LEXIS 409 at *5. Here, Maxwell is seeking to move the case to a jurisdiction where the non-party witnesses can be compelled to testify.

ultracapacitors accused by LIMITED in this case.  (D.I. 14, Balanson Decl. ¶ 5; D.I. 17, Gallay Decl. ¶ 7; D.I. 16, Schneuwly Decl. ¶ 7.)  A majority of the BOOSTCAP® ultracapacitors were invented in San Diego, and many of the Maxwell employees who designed the accused products in this case have retired or left Maxwell for other reasons.  (D.I. 14, Balanson Decl. ¶ 7.)  Maxwell has no control over those witnesses.  (*Id.*)

> **B.**     **The San Diego Action and the Delaware Action Involve the Same Technology, and the PTO Classification Differences Are Meaningless.**

LIMITED claims that there would be no saving of judicial resources if this action were transferred to the Southern District of California because the San Diego action "has no relation to the instant action."  (D.I. 23 at 4.)  LIMITED bases this assertion largely on the fact that the PTO placed LIMITED's '544 patent in a different "class" than the patents at issue in the San Diego litigation.  This difference purportedly renders the '544 patent "unrelated to Maxwell's patents at issue in the San Diego action."  (D.I. 23 at 14.)  But PTO classification has no bearing on the Southern District of California's consideration of the matter.

The Federal Circuit and its predecessor, the Court of Customs and Patent Appeals, have observed that differences in PTO classification are of little significance when examining claimed inventions.  In *In re Mlot-Fijalkowski*, 676 F.2d 666 (C.C.P.A. 1982), the court faced an argument similar to the one advanced by LIMITED.  There, a patent applicant sought to overcome an obviousness rejection by arguing that two of the references cited by the examiner were from a different class and therefore irrelevant.  *Id.* at 670.  The court rejected this argument noting that:

> While we find the diverse Patent Office classification of the references to be some evidence of "non-analogy," and likewise find the cross-reference in the official search notes to be *some* evidence of "analogy," we consider the similarities and differences in structure and function of the inventions disclosed in the references to carry far greater weight.

sd-360505

> Such evidence is inherently weak also, because
> considerations in forming a classification system differ
> from those relating to a person of ordinary skill seeking
> solution for a particular problem.

*Id.* n.5 (emphasis in original); *see also In re Huene*, No. 99-1514, 2000 U.S. App.

LEXIS 19978 at *12-14 (Fed. Cir. August 11, 2000) (recognizing that a patent in the

"Tool" classification was prior art to a "Surgery" patent based on its function and citing

*Mlot-Fijalkowski* for the proposition that classification is inherently weak evidence for

differences) (attached hereto as Ex. 1); *accord Orthopedic Equip. Co., Inc. v. United*

*States*, 702 F.2d 1005 (Fed. Cir. 1983) (combining prior art patents from two different

classes to invalidate a patent).  As with obviousness, infringement focuses on the

invention as claimed; the patent class will matter far less than the "structure and function

of the invention."  *Cf. Mlot-Fijalkowski*, 676 F.2d at 670.

Ultracapacitors are a combination of electrical and chemical components.  The

PTO must place them within its existing classification system.  Sometimes, like here, the

PTO classifies an ultracapacitor as a chemical invention with an electrical subclass, and

sometimes as an electrical invention with a chemical subclass.  Specifically, LIMITED's

'544 patent belongs to parent class 429 "Chemistry: electrical current producing

apparatus, product, and process" while the allegedly irrelevant '924 and '074 patents in

the San Diego action belong to parent class 361 "Electricity: electrical systems and

devices."  (D.I. 1 in C.A. No. 07-035-GMS, Exs. 1-2.)  It is clear from just this portion

of the definitions that all three patents relate to the field of electrical devices; however

the parent classification tells only half the story.  The primary subclass for the '544

patent is 94 "plural concentric or single coiled electrode."  (March 2, 2007 Declaration

of Brian M. Kramer In Support of Maxwell's Reply ("Kramer Reply Decl."), Ex. A

at 429-2.)  The primary subclasses for the '924 and '074 patents are 511 and 509

respectively which refer to "electrolytic systems or devices, liquid electrolytic

capacitors, anode type electrode" with the final element being "wound" for subclass 511

and "aluminum or tantalum" for subclass 509. (Kramer Reply Decl., Ex. B at 361-8.) All three patents are defined by the PTO classification system with respect to their electrode structure. In fact the structure of the electrodes described in the '544 patent and '924 patents, as defined by the PTO, are analogous with one described as "coiled" and the other "wound." Combining these definitions with the descriptions of the devices in the '544 and '924 patents it becomes clear that they relate to the same devices. *Compare* the '544 patent claim 1: "An electric energy storage device . . . comprising: at least one electrode formed by rolling up a stacked layer. . . " *with* '924 Patent claim 1: "A device for accumulating electrical energy comprising a substantially cylindrical winding of strips. . . ." (D.I. 1, Ex. 1; D.I. 1 in C.A. No. 07-035-GMS, Ex. 1.) The '074 patent primarily describes the structure of particular kinds of electrodes and is therefore relevant to both the '544 and '924 patents. (D.I. 1 in C.A. No. 07-035-GMS, Ex. 2.) In light of the small differences in the classification definitions and the similarity in claimed inventions, the two actions clearly involve similar inventions. This becomes even more apparent when the accused devices are considered.

Both this litigation and the San Diego litigation deal with ultracapacitor technology. In the San Diego action, Maxwell is seeking preliminary injunctive relief because LIMITED is trying to switch Maxwell's customers to LIMITED's "knockoff," infringing products. LIMITED's description of the technology at issue in this case is nearly identical to Maxwell's description from four months ago in the San Diego action:

| Maxwell's November 2, 2006 Description of the Technology-at-Issue in San Diego | LIMITED's February 23, 2007 Description of the Technology-at-Issue in Delaware |
| --- | --- |
| An ultracapacitor is an electrochemical capacitor with the ability to store a large amount of energy for a given mass compared to a normal capacitor, and the ability to deliver high levels of power for a given mass compared to a battery. Ultracapacitors are not as affected by temperature variations as | An ultracapacitor is a new alternative type of energy storage device. As compared to batteries, ultracapacitors provide up to one hundred times the power, operate reliably under extreme temperature conditions (i.e., -40°C to 60°C), last a very long time with little or no maintenance, and are |

sd-360505

| | |
|---|---|
| batteries, have a longer life, can be recharged almost instantaneously, and are not degraded by frequent or intensive use. . . .  Ultracapacitors have been predicted to be the next generation of energy supply units for electronic devices, potentially even replacing batteries in products ranging from calculators to automobiles. (Kramer Reply Decl., Ex. C at 3-4.) | environmentally friendly.  These robust characteristics make the ultracapacitor an ideal solution for an assortment of applications ranging from power quality, solar applications, portable telecom, and electronics, to automotive applications. The ultracapacitor is considered to be a key component for achieving fuel-efficient and "green" cars of the future. (D.I. 23 at 3.) |

There can be no question that the court which hears this action will need to learn ultracapacitor technology, be it Maxwell's, LIMITED's, or both.  There is a substantial technology overlap regardless of whether the accused ultracapacitors are LIMITED's or Maxwell's.

### C. The Balance of Private Interests Tips in Favor of Transfer.

#### 1. The Convenience of the Parties Favors Transfer to the Southern District of California.

Both parties are already litigating against each other in the Southern District of California.  Both parties have retained San Diego counsel to represent them.  With the exception of the Swiss inventors of a limited number of accused products, nearly all Maxwell witnesses, documents, and tangible evidence are located in San Diego.  With regard to LIMITED, its opposition brief does not address the arguments it made to the San Diego court trying to escape that court's jurisdiction:  "LIMITED has no offices in the United States, is not registered to do business anywhere in the United States, and has no registered agents in the United States. . . . LIMITED is a foreign corporation located in South Korea.  It has no presence in the United States."  (D.I. 15, Kramer Decl., Ex. 2 at 1; Kramer Reply Decl., Ex. D at 1-2.)  With no ties to or presence in the United States (with the obvious exception of its San Diego customers), Delaware cannot be any more convenient to LIMITED than any other forum in the United States.

The only connection to Delaware is Maxwell's state of incorporation.  While Maxwell is subject to personal jurisdiction in Delaware and should generally be

expected to litigate here, that factor is just one of many that the Court must consider under *Jumara*. Section 1404(a) could have been drafted to preclude corporations from transferring cases outside of their states of incorporation. Congress instead chose to focus the inquiry on the convenience of the parties, the convenience of the witnesses, and the interest of justice. *See* 28 U.S.C. § 1404(a). This Court, considering the other relevant factors, has granted motions to transfer by defendants who were Delaware corporations. *See, e.g.*, *Alloc, Inc. v. Unilin Decor N.V.*, C.A. Nos. 03-253-GMS, 05-857-GMS, 2006 U.S. Dist. LEXIS 78019 (D. Del. Oct. 26, 2006) (attached hereto as Ex. 2); *3Com Corp. v. D-Link Sys., Inc.*, C.A. No. 03-014 GMS, 2003 U.S. Dist. LEXIS 7120 (D. Del. Apr. 25, 2003) (attached to D.I. 13 as Ex. B); *Bayer Bioscience N.V. v. Monsanto Co.*, C.A. No. 03-023 GMS, 2003 U.S. Dist. LEXIS 4594 (D. Del. Mar. 5, 2003) (attached to D.I. 13 as Ex. C); *Allergan, Inc. v. Alcon Labs.*, C.A. No. 02-1682-GMS, 2003 U.S. Dist. LEXIS 2564 (D. Del. Feb. 25, 2003) (attached to D.I. 13 as Ex. D); *Ikos Sys. v. Cadence Design Sys.*, C.A. No. 02-1335-GMS, 2002 U.S. Dist. LEXIS 20574 (D. Del. Oct. 21, 2002) (attached to D.I. 13 as Ex. G); *Corixa Corp. v. Idec Pharms. Corp.*, C.A. No. 01-615 GMS , 2002 U.S. Dist. LEXIS 2980 (D. Del. Feb. 25, 2002) (attached hereto as Ex. 3); *Brunswick Corp. v. Precor Inc.*, C.A. No. 00-691-GMS, 2000 U.S. Dist. LEXIS 22222 (D. Del. Dec. 12, 2000) (attached hereto as Ex. 4); *Mentor Graphics Corp. v. Quickturn Design Sys.*, 77 F. Supp. 2d 505 (D. Del. 1999); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192 (D. Del. 1998). In each of those cases, this Court held that other factors outweighed the Delaware incorporation of the defendant.[2]

---

[2]    LIMITED claims that by filing its Answer and Counterclaims in this case, Maxwell has shown a "willingness to litigate in this forum." That makes no sense, particularly since Maxwell expressly states in its Answer that the case should be transferred to the Southern District of California. (D.I. 7 ¶ 5.) Filing a motion to transfer under 28 U.S.C. § 1404(a) does not relieve a party of its obligation to answer a complaint. Maxwell has done only the minimum in this jurisdiction to avoid a default

sd-360505

2.     **The Convenience of the Witnesses Favors Transfer.**

As explained above, because LIMITED has alleged willful infringement in this case, the actual Maxwell inventors, most of whom are located in San Diego, and none of whom are located within this Court's subpoena power, will have to testify about their mental state regarding LIMITED's allegations of willful behavior.  Some of the witnesses (*e.g.*, Dr. Bendale and Mr. Farahmandi) are no longer employed by Maxwell and cannot be compelled by Maxwell (or this Court) to testify in Delaware.

With regard to the Swiss inventors who work in Maxwell's San Diego facilities four times per year, LIMITED argues that party witnesses play no role in assessing the convenience of the witnesses, but then goes on to argue that Delaware is a convenient forum for its Korea-based chairman, Sunwook Kim, who testified that he "regularly" travels to the generic "east coast of the United States" and New York City.  (D.I. 19, Kim Decl. ¶¶ 9-10.)[3]  To the extent the Court considers these party witnesses at all, Maxwell submits that it is far more convenient for the Swiss inventors to travel less than 10 miles from Maxwell's San Diego facilities to the Southern District of California's courthouse than it is for LIMITED's Chairman to travel 129 miles from NessCap Inc.'s New York City office to the Caleb Boggs Federal Building.

With regard to the declaration of LIMITED's "U.S. Operations Project Manager," Hyun Jin Song, his testimony is at odds with the arguments made by LIMITED in San Diego.  Dr. Song states in his affidavit that he lives in the Unites States and regularly travels to Michigan, New Jersey, and Washington, D.C. to work with LIMITED's "U.S.-based customers."  (D.I. 20, Song Decl. ¶ 5.)  But LIMITED has told the San Diego court that LIMITED "has no offices in the United States" and "has no presence in the United States."  (D.I. 15, Kramer Decl., Ex. 2 at 1; Kramer Reply Decl.,

---

judgment or waiving its rights.  It has focused its efforts in the San Diego action, where it is actively seeking a preliminary injunction.

[3]     NessCap, Inc. has stated to the San Diego court that "Sunwook Kim plays no role in the day-to-day operations of LIMITED."  (Kramer Reply Decl., Ex. G at 6.)

Ex. D at 1-2.)  If Dr. Song is a nomadic businessman with no office to work from, he can travel to and testify in San Diego.  In fact, as the LIMITED employee who services LIMITED's "U.S.-based customers," Dr. Song presumably works in San Diego, too, since the only LIMITED customer identified by either party is located in San Diego County.  (D.I. 14, Balanson Decl. ¶ 12.)  Moreover LIMITED's claim that Dr. Song can testify about LIMITED's "U.S. activities" is so vague that any convenience to him cannot seriously be considered in the transfer analysis.

LIMITED claims that there are other, unidentified witnesses who will find that Delaware is a more convenient forum.  Specifically, LIMITED claims that the patent-at-issue was filed by a Washington D.C.-based law firm, and that is somehow relevant to Maxwell's allegations of inequitable conduct.  But Maxwell has not alleged misconduct by the prosecuting patent attorneys.  Rather, it has alleged misconduct by the LIMITED inventors who knew of but failed to disclose Maxwell's prior art.  (D.I. 7 ¶¶ 18-19.)  Moreover, according to PTO records, the patent attorney of record listed on the face of the patent-in-suit, Mr. Phillip Avruch, now lives over 1,000 miles away in South Florida.  (Kramer Reply Decl., Ex. E.)  Thus, even if Mr. Avruch were a witness in this case, the proximity of Washington D.C. to Wilmington is irrelevant.

### D.     The Balance of Public Interests Favors Transfer.

#### 1.     Trying Two Cases Involving the Same Parties and the Same Technology in Two Different Courts is Inefficient.

In its opening brief, Maxwell argued that, based on LIMITED's press release linking the San Diego action and this action, LIMITED would be asserting the '544 patent-in-suit in this case as prior art in the San Diego action.  LIMITED now claims that it is not asserting the '544 patent as prior art in the San Diego action.  While puzzling,[4] LIMITED's apparent admission that the '544 patent "is not prior art to either

---

[4]     The '544 patent appears on its face to have an April 25, 2000 priority date.  The '074 patent-at-issue in the San Diego action claims a May 12, 2000 priority date.  Thus,

sd-360505

U.S. Patent No. 6,525,924 or 6,631,074" is welcomed and accepted.  (D.I. 23 at 4.)
However, the overlap between the San Diego action and this action is not premised
solely on the assertion of the '544 patent as prior art in the San Diego action.  The two
cases still involve ultracapacitors, the same parties, and the same witnesses.  For
example, former Maxwell employee Priya Bendale will testify in this case on whether
she designed the accused products with the specific intent to infringe LIMITED's patent.
She likely will also testify in the San Diego action as the lead inventor of the patent-in-
suit.  Likewise, LIMITED's chairman, Sunwook Kim, will likely testify as an inventor
of the patent-in-suit in this case.  In the San Diego action, he has already submitted at
least one declaration and will be called to testify about damages, such as price erosion,
caused by LIMITED's infringing activities in California.

LIMITED has filed its opposition to Maxwell's motion for preliminary
injunction in the San Diego action, but did not serve Maxwell or otherwise identify the
prior art it is asserting against Maxwell's patents in the San Diego action.  LIMITED has
also filed a "mirror image" declaratory judgment action in this Court based on the
patents at issue in the San Diego litigation.  Because LIMITED's San Diego action
briefs remain under seal, any additional similarities between the San Diego action and
this action based on prior art asserted by LIMITED remain hidden from Maxwell and
this Court.  LIMITED's failure to provide Maxwell with its opposition brief to
Maxwell's preliminary injunction motion, while permitted, serves no purpose beyond
gamesmanship, especially in light of LIMITED's "mirror image" action filed against
Maxwell in this District.

### 2.     Delaware Has No Local Interest in This Case.

Not a single ultracapacitor has been sold in the State of Delaware by either party.
While Maxwell and LIMITED sell ultracapacitors throughout the world, that does not

---

on the face of the patents, it appears that the '544 patent could be prior art under some
sections of 35 U.S.C. § 102.

make Delaware the logical forum to litigate this case. San Diego has significant ties to this dispute. Most of the accused products were invented and manufactured in San Diego, and both parties have sold ultracapacitors to customers in San Diego. (D.I. 14, Balanson Decl. ¶ 12.)

LIMITED tries to turn this case into a local Delaware controversy by embracing the Delaware incorporation of its parent, NessCap, Inc. But LIMITED has failed to address the statements it made to the San Diego court that the two entities are separate: "[T]here is no evidence of an agency relationship between NessCap, Inc. and LIMITED. LIMITED operates independently from NessCap, Inc. . . ." (D.I. 15, Kramer Decl., Ex. 3 at 3); "[I]t is apparent that NessCap, Inc. and LIMITED are two distinct entities." (Kramer Decl., Ex. 4 at 3.)

LIMITED currently has a Rule 12(b)(5) motion to dismiss for insufficient service of process pending in the San Diego action. In that case, LIMITED was served with the San Diego action complaint in both New York and at NessCap, Inc.'s registered agent in Wilmington, Delaware. LIMITED maintains that it could not be served with the complaint in Delaware because it is not sufficiently related to NessCap, Inc. to establish ties to this jurisdiction. (Kramer Reply Decl., Ex. F at 1-3.) However, in this Court, LIMITED repeatedly mentions the Delaware incorporation of its parent and the Wilmington address of its registered agent in an effort to convince this Court that Delaware is the appropriate forum for this lawsuit. LIMITED cannot have it both ways. If it tells the San Diego court that it cannot be served in Delaware, LIMITED cannot tell this Court that the "home turf" rules apply and that its choice of this forum should be respected.[5]

---

[5]    There is no chance that the San Diego action will be dismissed with prejudice as to LIMITED. LIMITED has conceded that it is subject to personal jurisdiction in San Diego, presumably because it sells products in San Diego. Its remaining argument regarding insufficient service of process will be mooted shortly because Maxwell is eliminating any possible service issue by serving LIMITED a third time – this time in

3. **The Lack of Congestion in the Southern District of California Favors Transfer.**

LIMITED does not dispute that there are 463 pending cases per judgeship in Delaware, compared to only 256 in the Southern District of California. (*Compare* D.I. 15. Kramer Decl., Ex. 9 *with* Ex. 10.) LIMITED instead points to a different statistic indicating that the average time to trial is 23.5 months in Delaware compared to 25.4 months in Southern California. LIMITED then claims on that basis that the parties will save costs in this District. (D.I. 23 at 16.) Putting aside that the less than two month difference is meaningless on its face, LIMITED's argument ignores that absent a transfer, the parties will engage in 23.5 months of litigation in one district <u>in addition to</u> 25.4 months of litigation in the other district. A total of 48.9 months of litigation cannot be more efficient than half as many months in one jurisdiction.

## III.    THE SECOND DELAWARE ACTION SHOULD BE DISMISSED

Maxwell explained in its opening brief that LIMITED filed its compulsory counterclaims from the San Diego action as a separate lawsuit in this Court, C.A. No. 07-035-GMS. That action ("the second Delaware action") is a "mirror image" of the San Diego action and seeks a declaratory judgment that the exact patents at issue in the San Diego action are not infringed and are invalid. LIMITED admitted in its opposition brief that the second Delaware action was filed for the sole purpose of having a case on file outside of San Diego in case the San Diego action is dismissed. Maxwell will file a separate motion to strike the "backup" lawsuit clogging this Court's docket. Maxwell will not object if the Court instead dismisses that case *sua sponte*.

---

South Korea under the Hague convention. Thus, LIMITED will face the preliminary injunction in San Diego upon the earlier of: (1) Judge Houston holding that service in Delaware was sufficient; or (2) completing service under the Hague convention.

sd-360505

## IV.    CONCLUSION

For the foregoing reasons, this Court should transfer this case to the Southern

District of California.[6]


Dated: March 2, 2007                    YOUNG CONAWAY STARGATT & TAYLOR


                                        /s/ *Karen E. Keller*
                                        _____
                                        Josy W. Ingersoll (No. 1088)
                                        Karen E. Keller (No. 4489)
                                        1000 West Street
                                        Brandywine Building, 17th Floor
                                        Wilmington, DE 19801

                                        P.O. Box 391
                                        Wilmington, DE  19899-0391
                                        (302) 571-6689
                                        kkeller@ycst.com

                                        MORRISON & FOERSTER LLP
                                        David C. Doyle (CA Bar No. 70690)
                                        Brian M. Kramer (CA Bar No. 201780)
                                        12531 High Bluff Drive, Suite 100
                                        San Diego, CA 92130
                                        (858) 720-5100
                                        ddoyle@mofo.com

                                        *Attorneys for Defendant Maxwell Technologies, Inc.*

---

[6]      LIMITED's gratuitous paragraph alleging that Maxwell failed to "meet and confer" on this motion is nonsense.  (D.I. 23 at 1.)  Maxwell stated in its Answer filed weeks before this motion that it would be moving to transfer this case to the Southern District of California.  (D.I. 7 ¶ 5.)  LIMITED did not agree to a transfer and thereafter filed its compulsory counterclaims from the San Diego action in yet another lawsuit in Delaware.  Counsel for Maxwell called LIMITED's counsel of record the day it sought to file this motion asking for its consent.  LIMITED's counsel advised Maxwell's counsel to speak  to other LIMITED lawyers who never returned our call and who were supposedly unavailable to "meet and confer" on the motion to transfer that day or even the next day.  Two days later, Maxwell's counsel finally pinned down a LIMITED lawyer, who still claimed he was unprepared to "meet and confer."  Maxwell satisfied its Local Rule 7.1.1 "meet and confer" obligations despite LIMITED's best efforts to turn the rule into a tool to delay the filing of the motion.

sd-360505

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on March 2, 2007, the foregoing document

was electronically filed with the Clerk of the Court using CM/ECF which will send notification that

such filing is available for viewing and downloading to the following counsel of record:

>  Denise Seastone Kraft, Esquire
>  EDWARDS ANGELL PALMER & DODGE LLP
>  919 North Market Street
>  Suite 1500
>  Wilmington, DE 19801
>  *dkraft@eapdlaw.com*

I further certify that on March 2, 2007, the foregoing document was served by hand delivery

on the above-listed counsel of record and on the following non-registered participants in the manner

indicated below:

**BY E-MAIL ON MARCH 2, 2007 AND**
**FEDERAL EXPRESS ON MARCH 5, 2007**

George W. Neuner, Esquire
Brian M. Gaff, Esquire
EDWARDS ANGELL PALMER & DODGE LLP
101 Federal Street
Boston, MA 02110

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600
*kkeller@ycst.com*

# EXHIBIT 1

LEXSEE 2000 U.S. APP. LEXIS 19978



Analysis
As of: Mar 02, 2007

### IN RE DONALD R. HUENE

### 99-1514

### UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*2000 U.S. App. LEXIS 19978*

**August 11, 2000, Decided**

**NOTICE: [*1]** RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 37478.*

**PRIOR HISTORY:** (Serial No. 08/425,453).

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant sought review of the judgment of the Board of Patent Appeals and Interferences sustaining the rejection under *35 U.S.C.S. § 103* of various claims in his application to patent an absorbable bone screw and insertion tool, used in surgical applications.

**OVERVIEW:** Appellant's patent for his absorbable bone screw and insertion tool claimed that its concern was to remedy the problem of absorbable screws becoming knocked off-axis during insertion. Appellant claimed that his system assured the proper orientation of the screw relative to the driver at all times. The Patent and Trademark Office rejected several of appellant's claims as obvious under several prior art references, and the lower tribunal affirmed. Appellant's primary argument on appeal was that a prior art reference to a titanium aircraft screw (aircraft reference) was used to determine obviousness, whereas his claim was for a bio-absorbable

bone screw. Among other rulings, the court held that the aircraft reference was suitable analogous art for determining obviousness. It addressed a similar problem as did appellant's invention: how to prevent the misalignment of the installation tool and the fastener so that the tool did not "cam out" of the fastener head, thus stripping the head and ruining the fastener.

**OUTCOME:** Court affirmed lower tribunal's judgment, because it did not err in using prior art reference regarding aircraft screw driving system to determine the obviousness of appellant's bone screw driving invention. Both concerned same problem of maintaining proper alignment of driver to prevent stripping of screw head.

**LexisNexis(R) Headnotes**

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > Claimed Invention as a Whole*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN1] Under *35 U.S.C.S. § 103,* a patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

*Patent Law > Nonobviousness > Elements & Tests > General Overview*

[HN2] Obviousness under *35 U.S.C.S. § 103* is a legal conclusion based upon four factual inquiries. These inquiries consist of (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*
[HN3] In the context of patent law and the non-patentability of an invention because of obviousness, the United States Court of Appeals for the Federal Circuit (court) reviews the ultimate conclusion of obviousness de novo. The court reviews the Board of Patent Appeals and Interferences' fact findings under the substantial evidence standard of the Administrative Procedure Act.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations*
[HN4] In the context of patent law and the non-patentability of an invention because of obviousness, the scope of the prior art has been defined as that reasonably pertinent to the particular problem with which the inventor was involved. Secondary considerations include evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN5] In the context of patent law and the non-patentability of an invention because of obviousness, whether a prior art reference is analogous art is a question of fact. Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN6] In the context of patent law, the non-patentability of an invention because of obviousness, and the use of prior art references that are only analogous to the claimed invention, a reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem. Consequently, the purposes of both the invention and the prior art are important in determining whether the reference is reasonably pertinent to the problem the invention attempts to solve. Thus, if a reference discloses has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN7] In the context of patent law and the non-patentability of an invention because of obviousness, as far as the matter of analogous prior art is concerned, evidence of classification of prior art in different categories by the Patent and Trademark Office is inherently weak, because considerations in forming a classification system differ from those relating to a person of ordinary skill seeking solution for a particular problem.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Elements & Tests > Teaching Away From Invention*
[HN8] In the context of patent law and the non-patentability of an invention because of obviousness, whether a prior art reference "teaches away" from a claimed invention depends on the particular facts. In general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant.

**JUDGES:** Before NEWMAN, PLAGER, and SCHALL, Circuit Judges.

**OPINION BY:** SCHALL

**OPINION:** SCHALL, Circuit Judge.

DECISION

Donald R. Huene ("Huene") appeals from the decision of the Board of Patent Appeals and Interferences ("Board") sustaining the rejection under *35 U.S.C. § 103* of claims 1-7, 9-11, and 14-24 of U.S. patent application no. 08/425,453, which were all of the claims pending in Huene's application. We affirm.

DISCUSSION

I.

A. The Huene Application

Huene's application is directed to an absorbable bone screw and a tool for its insertion. The screw is used in surgery to attach bone fragments. In the "FIELD OF THE INVENTION" portion of his application, Huene states: "The disclosed invention is a screw for the internal fixation of bone fragments. The screw is manufactured from a material which is absorbable by the body . . . A tool to which the screw may be selectively fixed is also disclosed, and the tool maintains proper orientation and [*2] alignment of the screw throughout the insertion process." The prior art teaches that the use of absorbable bone screws is advantageous over the use of metal screws.

In the "BACKGROUND OF THE INVENTION" of his application, Huene states: "Absorbable bone screws . . . generally are formed from materials not having the strength characteristics of metal, so that prior surgical screwdrivers may not maintain proper orientation of the screw relative to the driver. The absorbable screw may, for example, become cocked or knocked off axis during insertion, with the result that the screw may not be properly inserted." Huene also describes "a need for an absorbable bone screw and a tool for its insertion which assure the proper positioning of the screw relative to the driver at all times. The disclosed invention is thus directed to a unique absorbable bone screw, and a tool especially adapted for insertion of that bone screw."

In the "OBJECTS AND SUMMARY OF THE INVENTION" of his application, Huene states: "The primary object of the disclosed invention is an absorbable bone screw which cooperates with a driver for maintaining proper orientation of the screw relative to the driver."

Figure 1 of [*3] the application shows an embodiment of the bone screw of the invention 10, 12, and 16 attached to the driver D1 of the invention. Figure 2 shows an embodiment of the bone screw and a portion of the attached driver. Figure 3 shows an embodiment of the bone screw that is not attached to a portion of the driver. In Figures 2 and 3, the screw S1 has a series of slots 24 configured to receive keys 44 extending from the driver D1. Another embodiment of the invention is shown in Figure 6, where screw S2 has a series of detents 68 for receiving posts 78 extending from the driver D2. In both embodiments, the screw head has a central threaded bore 22 or 66, separate from the detents or slots, that receives the threaded end of rod 28 (Figure 1) of the driver to secure the screw to the driver tool.

[SEE FIGURES 1, 2, 3 AND 6 IN ORIGINAL]

Claim 1 was selected as representative of claims 1-3, 6, 7, 9-11, 14-19, and 22-24. Claim 1 recites:

A bone screw, comprising:

a) a threaded shank having an axis of rotation;

b) a head integral with said shank, said head including a surface disposed generally normal to said axis and said head and said shank formed from a bioabsorbable material;

c) a [*4] plurality of driver means disposed about said surface wholly remote from said axis, each of said driver means adapted for engagement with a cooperating driver element of a rotary driver so that said head and thereby said shank may be rotated about said axis; and

d) a threaded bore coaxial with said axis extending inwardly from said surface for threadedly engaging a cooperating threaded element of the rotary driver.

Claim 4 was chosen as representative of claims 4, 5, 20 and 21. Claim 4 recites:

The bone screw of claim 2, n1 wherein:

a) each of said driver means opens on the periphery of said head.

n1 Claim 2 recites: "The bone screw of claim 1, wherein: a) each of said driver means is formed in said head and opens on said surface."

B. The Prior Art

Gogolewski

U.S. Patent No. *5,275,601* to Gogolewski et al. ("Gogolewski") discloses a self-locking absorbable bone screw and plate system, as shown in Figures 1a, 4a, and 4b below. The absorbable bone screw has a threaded shaft for insertion **[\*5]** into the bone, and a head to connect it in the screw hole of a bone plate. The head is flared and the outer surface is corrugated to lock into the bone plate. The bone screw has a hexagonally shaped hole to allow insertion of the bone screw with the use of a hexagon shaped tool.

[SEE FIGURE 1a AND FIGURE 4b IN ORIGINAL]

Treharne

U.S. Patent No. *4,973,333* to Treharne ("Treharne") discloses a reabsorbable compressing screw for repairing bone fractures, shown in Figure 2 below. The screw can be provided with a head that is designed to allow a faster absorption rate by exposing more of its surface area to body fluids. The screw also can include a head with notches and slots to accommodate a driving tool.

[SEE FIGURE 2 IN ORIGINAL]

Rich

U.S. Patent No. *4,466,314* to Rich ("Rich") is entitled "NONSLIP FASTENER TORQUING SYSTEM." Rich discloses a nonslip fastener torquing system that uses a fastener (e.g., a screw) with a special head that has a "threaded recess" and "torque receiving recesses" matched to a tool that threadably engages (i.e., screws into) the head and uses the threaded engagement to provide a solid base for torque applicators, such as drive pins or **[\*6]** drive blades so that high torque fasteners, which otherwise would use Phillips or other torquing systems, can be installed and removed without fear that the torquing tool will cam out of the head of the fastener and thereby ruin the fastener. As shown in Figures 1 through 4 below, Rich describes a driver tool 26 having a stud 28 that threadably engages the bore 18 of a screw 12. An advantage of Rich is that it does not require a jig or other holding device to prevent the camming action, thus reducing the cost of installing and removing the fasteners.

[SEE FIGURES 1, 2, 3 AND 4 IN ORIGINAL]

In the "BACKGROUND OF THE INVENTION" Rich teaches that, in the aerospace industry, there is an extensive use of fasteners which are torqued to high levels. These fasteners commonly are made from expensive materials, such as titanium. Conventional slots, or arrangements such as Phillips heads, tend to fail when the torquing tool is not perfectly centered or oriented with respect to the head of the screw. The common failure mode is for the tool to come out of alignment with the fastener head and cam out of the recess in the head--causing the recess to become deformed and making the fastener unusable. **[\*7]** This can present a sizable manufacturing and maintenance expense.

Rich identifies a "need for a positive, recessed, fastener torquing system whose tooling can be used universally and which greatly reduces the cost of installing and removing the fasteners." Rich also teaches that "it is an object of the present invention to provide a fastener torquing system which can be used repeatedly without damage to the head of the fastener." Another object of Rich "is to eliminate the 'camming out' problem commonly associated with fasteners having recessed torqued application means." Yet another object of Rich "is to provide a torque application system which can be adapted to various sizes of fasteners and torque requirements."

Boschetto

U.S. Patent No. *4,466,315* to Boschetto et al. ("Boschetto") discloses a combination tool that is used to drive simultaneously a screw requiring a screwdriver as a driving element and a screw requiring a spanner wrench as a driving element, as shown in Figure 1 below. One object of the invention is to provide a tool including the spanner wrench that can be used without the screwdriver portion. One embodiment shows peripheral slots extending longitudinally **[\*8]** of the sleeve-like body. Another embodiment shows the slots opening on the periphery of the screw head. The peripheral slots are engaged by the lugs of the spanner wrench portion of the combination tool.

[SEE FIGURE 1 IN ORIGINAL]

C. Procedural History

During prosecution, the examiner rejected claim 1 for obviousness in view of Gogolewski and Rich, or Treharne and Rich. The examiner also rejected claim 4 for obviousness in view of Gogolewski, Rich and Boschetto, or Treharne, Rich and Boschetto. The Board affirmed the examiner's rejections.

With respect to representative claim 1, the Board found that Gogolewski and Treharne disclose reabsorbable bone screws with a head portion. The Board also found that Rich discloses a nonslip fastener torquing system. With respect to representative claim 4, the Board found that Boschetto discloses a screw head with slots along its periphery. The Board rejected Huene's argument that Rich is nonanalogous art and determined that Huene's secondary evidence of nonobviousness did not overcome the strong prima facie case of obviousness.

2000 U.S. App. LEXIS 19978, *

Huene requested rehearing. The Board granted the request to the extent of reconsidering its decision, but denied [*9] the request with respect to making any changes in the decision. The Board also noted a typographical error in its earlier opinion with respect to its conclusion that Rich is analogous art under the test set forth in *In re Wood, 599 F.2d 1032, 1036, 202 U.S.P.Q. (BNA) 171, 174 (CCPA 1979)* ("The determination that a reference is from a nonanalogous art is . . . two-fold. First, we decide if the reference is within the field of the inventor's endeavor. If it is not, we proceed to determine whether the reference is reasonably pertinent to the particular problem with which the inventor was involved."). In particular, the Board's earlier opinion mistakenly stated that "Rich falls at least into the former category [i.e., within the field of the inventor's endeavor] of the Wood test." The Board's opinion on rehearing made it clear that, in the Board's opinion, "Rich falls at least into the **latter** category of the Wood test" (emphasis in original), and that it had mistakenly referred to the "former" category of the Wood test in the earlier opinion.

II.

[HN1] Under *35 U.S.C. § 103*, "[a] patent may not be obtained . . . if the differences between [*10] the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." [HN2] Obviousness under *35 U.S.C. § 103* is a legal conclusion based upon four factual inquiries. See *B.F. Goodrich Co. v. Aircraft Braking Systems Corp., 72 F.3d 1577, 1582, 37 U.S.P.Q.2D (BNA) 1314, 1318 (Fed. Cir. 1996).* "These inquiries consist of: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness." Id. (citations and quotations omitted). [HN3] We review the ultimate conclusion of obviousness de novo. See *In re Donaldson Co., 16 F.3d 1189, 1192, 29 U.S.P.Q.2D (BNA) 1845, 1848 (Fed. Cir. 1994)* (en banc). We review the Board's fact findings under the substantial evidence standard of the Administrative Procedure Act. See *Dickinson v. Zurko, 527 U.S. 150, 152, 144 L. Ed. 2d 143, 119 S. Ct. 1816 (1999); In re Gartside, 203 F.3d 1305, 1315, 53 U.S.P.Q.2D (BNA) 1769, 1775 (Fed. Cir. 2000).* [*11]

[HN4] "The scope of the prior art has been defined as that 'reasonably pertinent to the particular problem with which the inventor was involved.'" *Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1535, 218 U.S.P.Q. (BNA) 871, 876 (Fed. Cir. 1983)* (quoting *In re Wood, 599 F.2d at 1036, 202 U.S.P.Q. (BNA) at 174).* "Secondary considerations include evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others." *B.F. Goodrich, 72 F.3d at 1582, 37 U.S.P.Q.2D (BNA) at 1318.*

Huene's main argument on appeal is that Rich is not analogous prior art and that, therefore, it was improperly combined with Gogolewski and Treharne. In particular, Huene argues that Rich is nonanalogous art because it is directed to a titanium aircraft screw, whereas Gogolewski and Treharne are directed to bioabsorbable screws. According to Huene, the problem Rich sought to solve arose due to the hardness of titanium. By contrast, Huene asserts, the problem he set out to solve (failure of the bone screw to maintain proper alignment during [*12] insertion) arose as a result of the softness of the absorbable fastener material. Thus, Huene claims that one confronting a problem due to the softness of material would not look to how others solved problems attributable to hardness. According to Huene, nothing in Rich suggests its use with soft materials, such as an absorbable bone screw. Also, Huene contends that the PTO itself has recognized that Rich is nonanalogous art because it has classified Rich differently than Gogolewski and Treharne. n2

n2 Rich is classified under U.S. Patent Class 81 (Tools), whereas Gogolewski and Treharne are classified under U.S. Patent Class 606 (Surgery).

[HN5] Whether a prior art reference is analogous art is a question of fact. See *In re Paulsen, 30 F.3d 1475, 1481, 31 U.S.P.Q.2D (BNA) 1671, 1675 (Fed. Cir. 1994).* We have stated that "two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference [*13] is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *In re Clay, 966 F.2d 656, 658-59, 23 U.S.P.Q.2D (BNA) 1058, 1060 (Fed. Cir. 1992)* (citations omitted).

Rich is not in the same field of endeavor as Huene. However, it still may properly be combined with Gogolewski or Treharne if it is reasonably pertinent to the problem Huene attempts to solve. See *id. at 659, 23 U.S.P.Q.2D (BNA) at 1060-61.* [HN6] "A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *Id., 23 U.S.P.Q.2D (BNA) at 1061.* Consequently, "the purposes of both the

Page 6

2000 U.S. App. LEXIS 19978, *

invention and the prior art are important in determining whether the reference is reasonably pertinent to the problem the invention attempts to solve." Id. Thus, we have stated that "if a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact [*14] supports use of that reference in an obviousness rejection." Id. [HN7] As far as the matter of analogous prior art is concerned, evidence of classification of prior art in different categories by the PTO "is inherently weak . . . because considerations in forming a classification system differ from those relating to a person of ordinary skill seeking solution for a particular problem." *In re Mlot-Fijalkowski, 676 F.2d 666, 670 n.5, 213 U.S.P.Q. (BNA) 713, 716 n.5 (CCPA 1982).*

We see no reason to disturb the Board's finding that Rich is analogous prior art and thus relevant to the obviousness inquiry. Rich is reasonably pertinent to Huene's field of endeavor because both Rich and Huene sought to solve the same problem--i.e., the misalignment of a tool and a fastener and the camming out that can occur due to misalignment. Rich is directed to the same purpose as Huene. The problem that Rich sought to solve was the destruction of fastener heads when the application tool slips out of alignment and the tool "cams out" of the screw head. This is the same problem described in Huene's application--i.e., maintaining the proper alignment of the screw and the tool during insertion of the [*15] screw. Significantly, neither Rich nor Huene points to the hardness or softness of the screw material as the cause of the problem he set out to solve. Rather, they both discuss the importance of maintaining alignment of the tool and the screw during insertion, and teach that it is misalignment of tool and fastener that causes the prob-

lem. The Board's factual determination that Rich is analogous art is supported by substantial evidence.

Huene also argues that Gogolewski teaches away from the claimed invention because it discusses difficulties in attempting to transfer features found with metal screws into bioabsorbable screws. In making this argument, Huene points to statements in Gogolewski that "the use of a thread thickness typical for metallic screws in the resorbable screws, would result in permanent erosion of the crests, and thus the loss of stability of bone fracture fixation."

We reject Huene's argument that Gogolewski teaches away from the claimed invention. [HN8] Whether a reference "teaches away" from a claimed invention depends on the particular facts. See *In re Gurley, 27 F.3d 551, 553, 31 U.S.P.Q.2D (BNA) 1130, 1131 (Fed. Cir. 1994).* "In general, a reference will teach [*16] away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." Id. That is not the case here. Gogolewski does not teach away from the claimed invention merely because it notes problems with "the use of a thread thickness typical for metallic screws." Significantly, it does not describe any difficulty in using absorbable material rather than metal in the context of the problem of camming out due to a failure to maintain alignment of the tool and screw during insertion.

For the foregoing reasons, the decision of the Board is affirmed.

Each party shall bear its own costs.

# EXHIBIT 2

LEXSEE



Caution
As of: Mar 02, 2007

**ALLOC, INC., BERRY FINANCE, N.V., and VALINGE ALUMINUM AB, Plaintiffs, v. UNILIN DECOR N.V., and QUICK-STEP FLOORING, INC., Defendants. ALLOC, INC., BERRY FINANCE, N.V., and VALINGE INNOVATION AB (f/k/a VALINGE ALUMINUM AB), Plaintiffs, v. QUICK-STEP FLOORING, INC., Defendant.**

**Civil Action No. 03-253 (GMS), Civil Action No. 05-857 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2006 U.S. Dist. LEXIS 78019**

**October 26, 2006, Decided
October 26, 2006, Filed**

**PRIOR HISTORY:** Alloc, Inc. v. Unilin Decor N.V., 2003 U.S. Dist. LEXIS 11917 (D. Del., July 11, 2003)

**CORE TERMS:** patent, convenience, flooring, successor, venue, principal place of business, motion to transfer, above-captioned, headquartered, litigate, weigh, disputed, personal jurisdiction, notions of fair play, alternative forum, public interest, local interest, incorporation, collectively, expeditious, inexpensive, convenient, litigating, distribute, infringing, discovery, laminate, lawsuits, fora

**COUNSEL:** [*1] For Alloc Inc., a Delaware corporation, Berry Finance N.V., a Belgian corporation, Valinge Aluminium AB, a Swedish corporation, Plaintiffs, Counter Defendants: Francis DiGiovanni, Connolly, Bove, Lodge & Hutz, Wilmington, DE; Daniel J. O'Connor, Pro Hac Vice; David I. Roche, Pro Hac Vice.

For Unilin Decor N.V., a Belgian company, Quick-step Flooring Inc., a Delaware corporation, Defendants: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For Unilin Decor N.V., Counter Claimant: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For Quick-step Flooring Inc., Counter Claimant: David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On March 5, 2003 and December 12, 2005, respectively, Alloc, Inc. ("Alloc"), Berry Finance, N.V. ("Berry"), and Valinge Innovation AB ("Valinge") (collectively, "Alloc") filed the above-captioned actions against Unilin Decor N.V. ("Unilin"), Quick-Step Flooring, Inc. ("Quick-Step"), and Unilin Flooring N.C., LLC ("Unilin NC") (successor [*2] to Quick-Step) (collectively, "Unilin"). In the March 5, 2003 complaint, Alloc alleges that Unilin is infringing United States Patent No. 6,516, 579 (the "'579 patent"). n1 In the December 12, 2005 complaint, Alloc alleges that Unilin is infringing United States Patent No. 5,706,621 (the "'621 patent"). These cases are part of a series of federal actions that Alloc has filed across the country involving the patents-in-suit and related patents. Presently before the court is Unilin's motion to transfer jurisdiction to the United

States District Court for the Eastern District of Wisconsin (the "Eastern District of Wisconsin"), pursuant to 28 U.S.C. § 1404(a). For the reasons discussed below, the court will grant the motion.

n1 On July 11, 2003, the court stayed the 03-253 action pending resolution of an appeal before the Federal Circuit, and the re-examination of a parent to the '579 patent. The appeal was resolved on May 24, 2004, and the court lifted the stay on March 31, 2006.

[*3] **II. BACKGROUND**

Valinge is the assignee of the '579 and '621 patents, which relate to a laminate flooring system that can be connected and installed without the use of glue. Valinge has licensed its patents to Berry who, in turn, has sublicensed its patent rights to Alloc. Valinge and Berry are foreign companies, incorporated and headquartered in Sweden and Belgium, respectively. Alloc is a Delaware corporation headquartered in Racine, Wisconsin.

Unilin Decor is a Belgian corporation, with its principle place of business in Wielsbeke, Belgium. Quick-Step was a Delaware corporation headquartered in Thomasville, North Carolina. Unilin NC (successor to Quick-Step) is a North Carolina limited liability company, with its headquarters in Thomasville, North Carolina. Unilin, specifically Unilin NC, sells Uniclic (R) laminate flooring products, *i.e.* the disputed products, throughout the United States.

Alloc has been litigating a case involving the '579 patent in the Eastern District of Wisconsin since 2000. *See Alloc Inc. v. Unilin Decor,* Case No. 2:00CV00999 (E.D. Wis. ) (Randa, C.J.) (the "Wisconsin Action"). On August 17, 2006, Chief Judge Randa granted Alloc's motion to [*4] amend its complaint to include the '621 patent. As a result, the Wisconsin Action involves the same patents that are at issue in the above-captioned cases. Fact discovery is set to close in the Wisconsin Action on November 15, 2006, and claim construction issues are set to be fully briefed by December 20, 2006.

**III. DISCUSSION**

Pursuant to section 1404(a), the court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice, . . . to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). It is within the court's discretion whether to transfer a case according to an individualized case-by-case consideration of convenience and the interests of justice. *Stew-*

*art Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F. Supp. 2d 192, 197 (D. Del. 1998). In making its determination under section 1404(a), the court must consider whether transferring these two actions would convenience (1) the parties and (2) the witnesses while (3) serving the interests of justice. *Affymetrix,* 28 F. Supp. 2d at 196. It [*5] is the movant's burden to establish the need to transfer. *See Truth Hardware Corp. v. Ashland Prods., Inc.,* 2003 U.S. Dist. LEXIS 409, No. C.A. 02-1541 GMS, 2003 WL 118005, at *1 (D. Del. Jan. 13, 2003).

As a threshold matter, the court must first ask whether Alloc could have brought these two actions in the Eastern District of Wisconsin. *See Tuff Torq Corp. v. Hydro-Gear Ltd. Partnership,* 882 F. Supp. 359, 361 (D. Del. 1994). If the court answers this question in the negative, then its inquiry ends. *See Camasso v. Dorado Beach Hotel Corp.,* 689 F. Supp. 384, 386 (D. Del. 1988) (refusing to transfer the case when the target forum could not exercise personal jurisdiction over one of the defendants).

Alloc contests Unilin's assertion that these two actions could have been brought in the Eastern District of Wisconsin. Alloc also contends that Unilin has failed to make a showing that these cases could have been originally brought in the Eastern District of Wisconsin. The court disagrees. According to Unilin's opening brief in support of its motion, the "[p]laintiffs have already sued Unilin Decor in that district [Eastern District of Wisconsin] and no one ever questioned [*6] venue. Unilin N.C., the successor to Quick-Step, distributes and sells the Uniclic (R) flooring product in Wisconsin, including in the Milwaukee area in which the District Court for the Eastern District is located." (D.I. 9, at 8 n.2.) Under 28 U.S.C. § 1391, a corporate defendant resides "in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Wisconsin's long-arm statute codifies federal due process requirements. *See Logan Productions, Inc. v. Optibase, Inc.,* 103 F.3d 49, 52 (7th Cir. 1996). Therefore, venue is proper in the Eastern District of Wisconsin if Unilin had minimum contacts within the Eastern District at the time the action was commenced, and the exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice. *See id.*

Here, Unilin has submitted the sworn declaration of Unilin Decor's legal counsel, which states that Quick-Step, an indirect subsidiary of Unilin Decor, was selling and distributing the disputed flooring in Milwaukee, Wisconsin as of March 5, 2003. (D.I. 15 P 2.) [*7] The declaration further states that Unilin NC (successor to Quick-Step) continues to sell and distribute the disputed flooring in Milwaukee, Wisconsin. (Id. P 3.) Moreover,

Alloc has already sued Unilin Decor in the Eastern District of Wisconsin without objection to venue. Accordingly, Unilin has demonstrated sufficient minimum contacts in the Eastern District of Wisconsin to confer personal jurisdiction on that court. The court believes this conclusion to be consistent with traditional notions of fair play and substantial justice. Therefore, venue is proper in Unilin's proposed transferee court. The court now turns to an examination of the remaining criteria enumerated in Section 1404(a) in order to determine if transfer is warranted.

When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995). This inquiry requires "a multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and [*8] the interest of justice, but all relevant factors, including certain private and public interests. *Id.* at 875. These private interests include: (1) the plaintiff's choice of forum; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the expected witnesses; and (6) the location of books and records, to the extent that they could not be produced in the alternative forum. n2 Among the relevant public interests are: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in decided local controversies at home; and (5) the public policies of the fora. *Id.* at 879-80.

n2 The first three of these private interest factors collapse into other portions of the *Jumara* analysis. Thus, the court will consider them in the context of the entire inquiry only. *See Affymetrix, Inc. v. Synteni, Inc.,* 28 F. Supp. 2d 192 (D. Del. 1998).

[*9]

After having considered the relevant factors, the court finds that Unilin has met its burden of demonstrating that transfer to the Eastern District of Wisconsin is appropriate. First, although Alloc is incorporated in Delaware and Quick-Step was incorporated in Delaware, and should reasonably expect to litigate in this forum, there is little connection between Delaware and this action or the parties. *See APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.,* 295 F. Supp. 2d 393, 398-99 (A party's incorporation in Delaware is not dispositive of a motion to

transfer. "Where an alternative forum is more convenient and has more substantial connection with the litigation 'incorporation in Delaware will not prevent transfer.'") Further, none of the parties have facilities in Delaware nor maintain their principal place of business in Delaware. Moreover, Alloc's principal place of business is Racine, Wisconsin, and Alloc, Valinge, and Berry are currently parties to the Wisconsin Action, which involves both the '570 and '621 patents. Thus, it would be more convenient for Alloc to litigate this case in Wisconsin. Additionally, while Unilin Decor is a Belgian corporation and Unilin [*10] NC has a principal place of business in North Carolina, both would prefer to litigate this case in Wisconsin, especially given the fact that Unilin Decor is already a defendant in the Wisconsin Action. n3

n3 The convenience of the expected witnesses is not a relevant consideration because neither party has produced witness lists or identified any witness who is a Delaware resident.

With respect to the documentary evidence, Unilin states that many of the relevant documents and other materials have already been produced in the Wisconsin Action, and that it can produce the documents it has as easily in Wisconsin as it can in Delaware. (D.I. 9, at 14.) Bringing relevant documents to only one location, here Wisconsin, minimizes the level of disruption caused to both parties by the litigation. *Omnicon Group, Inc. v. Employers Reinsurance Corp.,* 2002 U.S. Dist. LEXIS 1275, C.A. No. 01-839-GMS, 2002 WL 109346, at * 2 (D. Del. Jan. 28, 2002). In other words, it "is certainly a more economical and efficient result than having each [*11] party moving . . . documents between two states, depending on which of the[] related actions is being litigated at the time." *Omnicon Group, Inc. v. Employers Reinsurance Corp.,* 2002 U.S. Dist. LEXIS 1275, C.A. No. 01-839-GMS, 2002 WL 109346, at * 2 (D. Del. Jan. 28, 2002). Thus, the court finds that this factor weighs in favor of transfer.

Finally, the court finds that the public interest factors weigh in favor of transfer to Wisconsin. Most relevant to the courts inquiry, is whether there are practical considerations that would make trial "easy, expeditious, or inexpensive." *Jumara,* 55 F.3d at 879. Here, there has already been litigation on both the '579 and '621 patents in the Eastern District of Wisconsin. Discovery has already begun in the Wisconsin Action, which was filed before Alloc initiated these lawsuits, and involves the same patents. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *See Lig-*

*gett Group, Inc. v. R.J. Reynolds Tobacco Co.,* 102 F. Supp. 2d 518, 537 (D.N.J. 2000) (citations omitted). Additionally, the court is not persuaded that any disparity [*12] in court congestion, to the extent there is any, will be so great as to weigh against transfer. Finally, it is well settled that patent rights are not considered state or local matters, and do not implicate local interests. *Jones Pharma, Inc. v. KV Pharm. Co.,* 2004 U.S. Dist. LEXIS 2333, No. Civ. A. 03-786 JJF, 2004 WL 323109, at *3 (D. Del. Feb. 17, 2004). The court, therefore, finds no strong local interest in litigating in either forum. Accordingly, the court concludes that, on balance, the public interest factors favor transfer in the instant case.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: October 26, 2006

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendants' Motion to Transfer Venue to the Eastern District of Wisconsin (D.I. 8) is GRANTED.

2. The above-captioned actions are hereby TRANSFERRED to the United States District Court for the Eastern District of Wisconsin.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: October 26, 2006

# EXHIBIT 3

LEXSEE



Cited
As of: Mar 02, 2007

CORIXA CORPORATION, a Delaware corporation, et al., Plaintiffs, v. IDEC
PHARMACEUTICALS CORPORATION, a Delaware corporation, Defendant.

C.A. No. 01-615 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 2980

February 25, 2002, Decided

**DISPOSITION:** [*1] Defendant's motion to transfer action to Southern District of California GRANTED, Matter TRANSFERRED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A pharmaceutical corporation filed a complaint in California against defendants, three entities in different states, and sought a declaratory judgment of non-infringement regarding five patents. Two days later, defendants filed the instant action against the corporation and alleged patent infringement. The pharmaceutical corporation moved to stay the proceedings, or alternatively, to dismiss or transfer the action to California.

**OVERVIEW:** The patents at issue involved technology for the treatment of lymphoma. Applying the first-filed rule, the pharmaceutical corporation argued that the case should be transferred to California. Notwithstanding the fact that the cases at issue were mirror image cases where a court would be asked to construe the same patents, one of the defendants argued that the first-filed rule was inapplicable to the present situation. The court concluded that having two separate trials in mirror image cases would have defeated the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. Accordingly, the application of the rule weighed heavily in favor of transferring this case to California. There was no clear evidence that a non-party witness would have been unable to attend trial in the instant forum and this factor weighted against transfer. However, there was no indica-

tion that either party would be unable to produce the relevant records and documents in the instant forum. In the end, the court concluded that the balance of convenience tipped strongly in favor of transferring the action to California.

**OUTCOME:** The pharmaceutical company's alternative motion to transfer the action to California was granted and the matter was transferred.

**CORE TERMS:** patent, first-filed, balance of convenience, weigh, licensee, litigate, convenience, lawsuit, necessary party, transferring, declaratory judgment action, place of business, mirror image, presently, lymphoma, declaratory action, attendance, tip, declaratory judgment, motion to transfer, motion to dismiss, present situation, currently pending, motion to stay, radioimmunotherapy, above-captioned, inconvenience, transferred, recommended, unavailable

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
*Patent Law > Remedies > Declaratory Relief*
[HN1] Where two patent lawsuits involving the same claims are filed in different jurisdictions, the federal circuit requires that the first-filed action be given preference absent special circumstances. The first-filed doctrine also serves to prevent a multiplicity of actions and

to achieve resolution in a single lawsuit of all disputes arising from common matters. This doctrine applies equally well where the first-filed action is one for a declaratory judgment. noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.

***Civil Procedure > Parties > Joinder > General Overview***
***Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview***
***Patent Law > Ownership > Conveyances > General Overview***
[HN2] An exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.

***Civil Procedure > Venue > Federal Venue Transfers > General Overview***
[HN3] See 28 U.S.C.S. § 1404(a).

***Civil Procedure > Venue > Motions to Transfer > General Overview***
[HN4] The United States Court of Appeals for the Third Circuit provides a list of factors to assist district courts in determining whether, on balance, litigation would more conveniently proceed and the interests of justice would be better served by a transfer to a different forum. These factors include six private and five public interests which a court may consider.

***Civil Procedure > Venue > Motions to Transfer > General Overview***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***
[HN5] Factors determinative of whether venue should be changed include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents only to the extent that these files cannot be produced in the alternate forum.

***Civil Procedure > Venue > Motions to Transfer > General Overview***

***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***
[HN6] In regards to determining whether venue should be changed, depending on the circumstances of the case, some of the "public interest" factors may play no role in the balance of convenience.

**COUNSEL:** For CORIXA CORPORATION, COULTER PHARMACEUTICAL INC., SMITHKLINE BEECHAM CORPORATION, plaintiffs: Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For IDEC PHARMACEUTICALS CORPORATION, defendant: Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION:**

MEMORANDUM AND ORDER

I. INTRODUCTION

On September 10, 2001, IDEC Pharmaceutical Corporation ("IDEC") filed a complaint in the Southern District of California against Coulter Pharmaceutical Inc. ("Coulter"), Corixa Corporation ("Corixa"), and the Regents of the University of Michigan ("Michigan"). In its complaint, IDEC seeks a declaratory judgment of non-infringement and/or invalidity of five patents. On September 11, 2001, the Oncologic Drugs Advisory Committee ("ODAC") indicated that it would recommend a limited FDA approval of IDEC's drug Zevalin. On September 12, 2001, at approximately 8:33 A.M. PST, IDEC [*2] filed a first amended complaint which included a sixth patent.

On September 12, 2001, at 12:07 P.M. EST, Corixa, Coulter, and GlaxoSmithKline (GSK) (collectively "Corixa") filed the above-captioned action against IDEC. n1 Corixa alleges that IDEC is infringing U.S. Patent Nos. 6,015,542, ("the 542 patent"), 6,090,365 ("the 365 patent"), and 5,595,721 ("the 721 patent"). These patents are three of the patents involved in the California declaratory judgment action.

n1 On September 28, 2001, Michigan was added as a plaintiff in this action.

Presently before the court is IDEC's motion to stay the proceedings, or alternatively, to dismiss or transfer this action to the Southern District of California. n2 For the reasons that follow, the court will grant IDEC's motion to transfer.

> n2 IDEC sought to stay the proceedings pending a ruling from the California court on a motion to dismiss. On January 30, 2002, the California court denied the motion to dismiss. IDEC's current motion to stay is therefore moot.

[*3]

II. BACKGROUND

IDEC is a Delaware corporation with its sole place of business in the San Diego area. Coulter is a Delaware corporation with its principle place of business in the San Francisco Bay area. Corixa is a Delaware corporation based in Seattle, Washington. GSK is a Pennsylvania corporation with its principle place of business in Philadelphia, Pennsylvania. The University of Michigan is a constitutional corporation of the State of Michigan, located in Ann Arbor, Michigan.

The patents at issue involve technology for the treatment of lymphoma using targeted radioimmunotherapy. Coulter and Michigan are co-owners of the 542, 365, and 721 patents. Corixa and GSK are the licensees of these patents. Both IDEC and Corixa are currently seeking FDA approval for a commercial embodiment of their respective inventions for the treatment of lymphoma using radioimmunotherapy.

With these facts in mind, the court will now turn to the motion presently before it.

III. DISCUSSION

A. The "First-Filed" Rule

[HN1] Where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference [*4] absent special circumstances. *See Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993). The first-filed doctrine also serves to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters. *See id.* at 937. This doctrine applies equally well where the first-filed action is one for a declaratory judgment. *See id.* at 938 (noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.)

Applying the first-filed rule, IDEC argues that the present case should be transferred to the Southern District of California. Notwithstanding that the cases at issue are "mirror image" cases where the court is asked to construe the same patents, Corixa argues that the first-filed rule is inapplicable to the present situation.

Corixa first argues that GSK has not been joined in the California litigation. The record before the court indicates that GSK is Coulter's licensee. It is unclear whether GSK is an exclusive licensee. However, even were the court to accept [*5] Corixa's argument that GSK is an exclusive licensee, that alone does not indicate that GSK is a necessary party to this litigation. Corixa concedes that GSK is a licensee with fewer than all substantial rights. As such, GSK, while likely a proper party to the California lawsuit, is not a necessary party. *See Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1348 (Fed. Cir. 2001) (holding that [HN2] an exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.) Finally, to the extent that the parties believe that GSK is a necessary party, GSK may request permission to join the California litigation. n3

> n3 Corixa expresses concern over whether the California court has subject-matter jurisdiction over an action between IDEC and GSK. As it is not the court's province to determine another court's subject matter jurisdiction, the court expresses no opinion on this.

Corixa next argues that the [*6] first-filed rule is inapplicable to the present situation because IDEC improperly "raced to the courthouse" in order to file its motion in California. In support of this contention, Corixa points out that its right to file an infringement suit against IDEC did not ripen until after ODAC recommended that the FDA approve Zevalin. However, before ODAC publicly recommended approval, but after IDEC had reason to believe they would do so, IDEC "raced" to file its declaratory judgment action.

The court acknowledges that IDEC's filing seems providential since ODAC's recommendation became public the day after IDEC filed its suit. In its November 6, 2001 Order, however, the California court specifically found that IDEC possessed a reasonable apprehension of suit when it filed its declaratory judgment action. The California court continued by stating that, "an actual controversy existed when IDEC filed the complaint under consideration. Consequently the court finds that IDEC's filing suit was not motivated by "forum shopping alone," but rather was a legitimate exercise of its opportunity

under the Declaratory Judgement Act . . . ." This court sees no reason to disagree with the California court's [*7] findings.

Given the information presently before it, the court concludes that having two separate trials in mirror image cases would defeat the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. *See  EEOC v University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988). Accordingly, the court finds that the application of the rule weighs heavily in favor of transferring this case to the Southern District of California.

B. Section 1404(a)

Transfer to the Southern District of California is also mandated under a section 1404(a) analysis.  [HN3] Section 1404(a) provides that "for the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). There is no dispute that this action could have been filed in the Southern District of California. The court will, therefore, move on with inquiry as directed by the Third Circuit. *See  Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).

In *Jumara*,  [HN4] the Third Circuit provided [*8] a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. *See id.*

1. The Private Interests

The private interests most relevant to this case include:  [HN5] (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent that these files cannot be produced in the alternate forum. n4

n4 For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See  Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 197-201 (D. Del. 1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis.

*See id.* Instead, the court will consider whether the Southern District of California is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

[*9]

a. The Convenience of the Parties

Geographically, California is not more inconvenient for the parties than Delaware. Michigan must travel whether the suit is in California or Delaware. GSK is one of the world's largest pharmaceutical companies, and cannot complain about location. The remainder of the parties are based on the West Coast. Furthermore, transfer to California would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case currently pending in the Southern District of California. Bringing witnesses and relevant documents to only one location, here California, minimizes the level of disruption caused to all parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

b. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its [*10]  own employees for trial. *See  Affymeytrix*, 28 F. Supp. 2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internal citations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

There is no evidence on the record that would indicate that Delaware would be an inconvenient forum for potential non-party witnesses. However, the court notes that all the material witnesses in this dispute, party or otherwise, will be in California already to litigate the related matter now pending in the Southern District of California. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence [*11]  that a non-party witness will be

unable to attend trial in Delaware, this factor must weigh against transfer.

### c. The Location of Records and Other Documents

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. There is no indication that either party would be unable to produce the relevant records and documents in Delaware. Thus, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in California for the litigation of that case. The court sees no need to require that the parties move the same documents across the country. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra*.

### 2. The Public Factors

As other courts have noted, [HN6] depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role [*12] in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

### a. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by IDEC, and accepted by the court, in Section III.A, *supra*. As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

### b. Delaware's Interest in this Controversy

Three of the parties in this action are Delaware corporations. However, while the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the patents as a local controversy unique to Delaware. *See Affymetrix*, 28 F. Supp. 2d at 207. Instead, the patents deal with the treatment of lymphoma. This clearly has far-reaching implications. Accordingly, this factor does not weigh against transferring this case to California.

### c. Collective Travel Time and Cost

A mirror image action is currently pending in California. Thus, to require the parties [*13] to simultaneously litigate virtually the same case on different coasts would certainly increase the collective travel time and cost. Thus, this factor weighs in favor of transfer.

## IV. CONCLUSION

The court concludes that the "balance of convenience" tips strongly in favor of transferring this action to the Southern District of California.

For these reasons, IT IS HEREBY ORDERED that:

> 1. IDEC's alternative motion to transfer this action to the Southern District of California (D.I. 8) is GRANTED.

> 2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of California.

Dated: February 25, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

LEXSEE



Cited
As of: Mar 02, 2007

**BRUNSWICK CORPORATION, Plaintiff, v. PRECOR INCORPORATED., Defendant.**

**C.A. No. 00-691-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 22222**

**December 12, 2000, Decided**
**December 12, 2000, Filed**

**DISPOSITION:** [*1] Precor's motion to transfer granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder, a company incorporated in Delaware with a principal place of business in Illinois, brought an infringement action relating to exercise treadmills against defendant competitor, a company incorporated in Delaware with a principal place of business in Washington. The competitor moved to transfer the case pursuant to 28 U.S.C.S. § 1404(a).

**OVERVIEW:** The balance of the private factors tipped slightly in favor of transfer. The convenience of the parties, the convenience of the witnesses, and the location of records and books were the most pertinent of the private factors. Both parties were located outside of Delaware, the witnesses as well as the relevant documents and records were located in Washington, and the product at issue was designed and manufactured in Washington; therefore, the Western District of Washington was a more convenient forum for the litigation. Although the private factors tipped slightly in favor of the Western District of Washington, the relevant public factors weighed heavily in favor of transfer. There had already been litigation between the parties on another patent, a parent patent of the one at issue in the case, in the Western District of Washington. That matter was on appeal. Moreover, the parties were currently litigating another patent infringement matter involving exercise equipment

in the Western District of Washington. Thus, transferring the case would have promoted the interests of justice.

**OUTCOME:** The court granted the motion to transfer venue.

**CORE TERMS:** patent, western district, convenience, patent infringement, weigh, balance of convenience, fora, tip, motion to transfer, choice of forum, infringement, expeditious, inexpensive, paramount, lawsuit, serving, principal place of business, manufacture, slightly

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] Pursuant to 28 U.S.C.S. § 1404(a), the court may transfer this action to any other district where it might have been brought when it appears that a change of venue would convenience the parties and the witnesses while serving the interest of justice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
[HN2] In deciding a motion to transfer venue, the district court applies the most relevant public and private factors to the facts of the case as directed by the United States

Court of Appeals for the Third Circuit's decision in Jumara.These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice. The court should apply these factors to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer. The burden is on moving party to show that balance of convenience and the interests of justice weighs in favor of transfer.

*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN3] On a motion to transfer venue, the private interest factors may include: 1) the plaintiff's original forum preference; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and 6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). The public interest factors may include: 1) the enforceability of the judgment; 2) practical considerations that make the trial easy, expeditious, or inexpensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4) the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN4] A plaintiff's choice of forum is a "paramount" consideration on a motion to transfer venue that is not to be lightly disturbed.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN5] Most relevant to the court's inquiry on a motion to transfer venue is whether there are practical considerations that would make trial easy, expeditious, or inexpensive.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN6] Where related lawsuits exist, it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court.

**COUNSEL:** For BRUNSWICK CORPORATION, plaintiff: Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE.

For PRECOR INCORPORATED, defendant: Samuel David Brickley, II, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

On August 1, 2000, the plaintiff, Brunswick Corporation, and its division Life Fitness ("Life Fitness") brought this patent infringement action against Precor Incorporated ("Precor"). Life Fitness alleges that Precor is infringing its U.S. Patent No. 6,095,951 (" '951 patent") relating to exercise treadmills. Presently before this court is Precor's motion to transfer this case to the United States District Court for the Western District of Washington, pursuant to 28 U.S.C. § 1404(a). Because the court finds that a transfer would convenience the parties and the witnesses while serving the interests of justice, Precor's motion to transfer is granted.

I. BACKGROUND

A. The parties

Life Fitness and Precor both design, manufacture, [*2] and sell exercise equipment and both directly compete with one another in the exercise fitness market. Although both parties are incorporated in Delaware, neither party maintains a physical presence (e.g., offices or facilities) in this state. Life Fitness has its principal place of business in Franklin Park, Illinois and Precor has its principal place of business in Bothell, Washington.

B. Prior Litigation Between the Parties

"Life Fitness and Precor are no strangers to each other, nor to patent litigation." D.I. 7, at 2. In 1994, Precor filed a patent infringement suit against Life Fitness in the United States District Court for the Western District of Washington ("1994 litigation"). At issue in the 1994 litigation were .  U.S. Patent Nos 5,599,259, 5,752,897

and certain Claims of U.S. Patent No. 5,382,207 (respectively the " '259, '897, and '207 patents"). The '207 patent is the parent of the '951 patent currently at issue in the case before the court.

In the 1994 litigation, Claims 1-36 of '207 patent were dismissed on summary judgment in February 1996 leaving only claims 37, 38, and 39 at issue. In early September 1999, Life Fitness voluntarily stipulated to the dismissal [*3] of the claims for infringement of the '259 and '897 patents as well as Claims 38-39 of the '207 patent. As a result of this stipulation, these claims were dismissed with prejudice in an order dated September 23, 1999. *See Precor Inc. v. Life Fitness*, No. C94-1586C (W.D. Wash. Sept. 23, 1999) (stipulation and order of dismissal). Thus, the only infringement claim remaining for trial related to Claim 37 of the '207 patent. In October 1999, Life Fitness lost at trial as to this one patent claim. The judgment from the 1994 litigation is currently on appeal to the Federal Circuit.

## II. DISCUSSION

[HN1] Pursuant to 28 U.S.C. § 1404(a), the court may transfer this action to "any other district where it might have been brought" when it appears that a change of venue would "convenience" the parties and the witnesses while serving the "interest of justice." 28 U.S.C. § 1404(a) (1993). The parties here agree that Life Fitness could have brought this action in the Western District of Washington. *See* 28 U.S.C. S 1391(b)(1) (1993). Moreover, this lawsuit could have initially been filed in Washington because it is a patent [*4] infringement matter. *See* 28 U.S.C. § 1400(b). Therefore, [HN2] the court will next apply the most relevant public and private factors to the facts of the case as directed by the Third Circuit's decision in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara*, the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. 55 F.3d at 879-80; *see also Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp.2d 192, 196-97 (D. Del. 1998). These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice. *Jumara*, 55 F.3d at 879-80. n1 The court should apply these factors to determine, "on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Id.* at 883 (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30-31, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)). [*5] The burden is on moving party to show that balance of convenience and the interests of justice weighs in favor of transfer. *See Jumara*, at 879.

n1 [HN3] The private interests may include: 1) the plaintiff's original forum preference; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses-- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and 6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Jumara*, 55 F.3d at 879-880. The public interests may include: 1) the enforceability of the judgment; 2) practical considerations that make the trial easy, expeditious, or inexpensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4) the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

[*6]

### A. Private Factors

The court concludes that the balance of the private factors tips slightly in favor of transfer. In this case, the court finds the convenience of the parties, the convenience of the witnesses, and the location of records and books to be the most pertinent of the private factors. Although both parties are incorporated in Delaware, Precor maintains its headquarters in the Western District of Washington and Life Fitness in Franklin Park, Illinois. Additionally, neither of the parties, their witnesses, or any of the potentially relevant documents and records are located in Delaware.

Recognizing that the balance of convenience tips toward the Western District of Washington, Precor further argues that Life Fitness will suffer no greater inconvenience in traveling to Washington than Delaware. In contrast, Life Fitness argues that its choice of forum is paramount. The court acknowledges that [HN4] a plaintiff's choice of forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995). In this case, [*7] however, the plaintiff's preference for Delaware is not given as much deference because most of the events at issue, that is, the design and manufacture of the exercise equipment, occurred outside of Delaware. *See Britamco Underwriters, Inc. v. Wallace*, 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999). "The transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen . . .

2000 U.S. Dist. LEXIS 22222, *

a forum where the alleged wrongful activity occurred." *Continental Casualty Co. v. American Home Assurance Co.*, 61 F. Supp. 2d 128, 131 (D. Del. 1999). Thus, because the parties are located outside of Delaware, the witnesses as well as the relevant documents and records are located in Washington, and the product at issue was designed and manufactured in Washington, the Western District of Washington is a more convenient forum for the litigation.

B. Public Factors and the Interest of Justice

Although the private factors tip slightly in favor of the Western District of Washington, the relevant public factors weigh heavily in favor of transfer.  [HN5] Most relevant to the courts inquiry is whether there are practical considerations that would make [*8]  trial "easy, expeditious, or inexpensive." *Jumara*, 55 F.3d at 879. In this case, there has already been litigation on the '207 patent, a parent patent of the one at issue here, in the Western District of Washington. This matter is on appeal. Moreover, the parties are currently litigating another patent infringement matter involving exercise equipment in the Western District of Washington. n2 [HN6] Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *See  Liggett Group, Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518,

(D.N.J. 2000) (citations omitted). Thus, the court finds that transferring this case would promote the interests of justice.

n2 The parties disagree as to whether this is a directly related matter.

**III. CONCLUSION.**

Finding that the balance of convenience and the interests of justice weigh in favor of transfer,

IT IS HEREBY ORDERED that:

1. Precor Incorporated's [*9]  Motion to Transfer is GRANTED; and

2. This matter shall be TRANSFERRED to the Western District of Washington.

Date: December 12, 2000

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE